## JONES, ASSIGNEE, *v.* WHITWORTH.

### (*Nashville.* April 22, 1895.)

1. CORPORATIONS. *Liability of stockholders; pleadings.*

   Creditors of an insolvent corporation, or an assignee for their benefit, cannot maintain bill against its stock subscribers who have paid their subscriptions in property which the corporation was legally authorized to buy or receive, for the difference between the face value of the subscription and the real value of the property, without distinct averment that the overvaluation of the property was intentionally fraudulent or so gross and palpable as to be constructively fraudulent as to corporate creditors. Averment that property was "not conveyed at a fair cash value, but very far in excess of it," is insufficient. (*Post, pp. 605–608.*)

   Cases cited and approved: Kelley Bros. *v.* Fletcher, *ante,* p. 1; Shields *v.* Clifton Hill Land Co., *ante,* p. 160; 5 Dillon, 50; 31 N. E. Rep., 362; 119 U. S., 345; 110 Ind., 417; 78 Wis., 427 (S. C., 23 Am. St. R., 419–421); 92 Ala., 407 (S. C., 25 Am. St. R., 82, 83).

   Question reserved: Whether the proper measure of relief in such case is recovery of difference or rescission of contract. (*Post, p. 614.*)

2. SAME. *Stock subscriptions inure to benefit of all creditors.*

   Unpaid stock subscriptions are made by statute in this State to inure to the benefit of all creditors alike, whether their debts were created before or after the subscriptions were made. (*Post, pp. 608–610.*)

   Code construed: § 1708 (M. & V.).

   Act construed: Acts 1875, Ch. 142, Sec. 5.

   Case cited and approved: Shields v. Clifton Hill Land Co., *ante,* p. 158.

   Cited and distinguished: 3 Mason, 308; 13 Wis., 60; 11 Ala., 437; 35 N. J. Eq., 501; 17 Wall., 611; 42 Minn., 327 (S. C., 18 Am. St. R., 516); 139 U. S., 436; 48 Minn., 174 (S. C., 31 Am. St. R., 646).

Jones, Assignee, *v.* Whitworth.

3. SAME. *Insufficient averments to hold stock subscriber.*

The creditors of an insolvent corporation, or an assignee for their benefit, cannot recover against its stockholder upon the averment that $59,800 of unsubscribed stock was issued to him as compensation for services rendered in negotiating the sale of $85,000 of its bonds, without any averment that the transaction was fraudulent, or that the compensation was unreasonable. He became purchaser, not subscriber, of the stock. (*Post, pp. 621–623.*)

4. STATUTE OF LIMITATIONS. *Of six and ten years do not bar suit by corporate creditors against stockholders, when.*

The statute of limitations of six and ten years do not begin to run against the right of corporate creditors to enforce the liability of stockholders for the difference between the amount of their subscriptions and the real value of land conveyed to the corporation at a fraudulent overvaluation in payment therefor, until the legal insolvency of the corporation has occurred. (*Post, pp. 610–613.*)

Cases cited and approved: Moses *v.* Ocoee Bank, 1 Lea, 404; Marr *v.* Bank, 4 Lea, 593; 105 U. S., 143: 3 Am. St. Rep., 29, 30; *Ib.*, 881.

5. SAME. *Of two years protects estates of deceased stockholders, when.*

The estate of a deceased stockholder is protected by the statute of limitations of two (and one half) years, where suit for collection of difference between the amount of his subscription and the real value of land conveyed at a fraudulent overvaluation in payment thereof, is brought against his personal representative by resident corporate creditors, or their resident assignee, more than two and one half years after the legal insolvency of the corporation had occurred. This statute runs from date of such insolvency, and not from date of the fraudulent transaction or of the administration. (*Post, pp. 614–617.*)

Code construed: §§ 3117, 3481 (M. & V.); §§ 2279, 2784 (T. & S.).

Cases cited and approved: Bradford *v.* McLemore, 3 Yer., 319; Trott *v.* West, 9 Yer., 436; Atkinson *v.* Brooks, 10 Yer., 485.

6. SAME. *Six months after decedent's death not deducted, when.*

When a creditor's right to sue does not accrue for more than six months after administration upon his debtor's estate, his suit is barred, unless it is instituted within two years after the

accrual of his right to sue. An additional six months is not allowed in such case. (*Post, p. 617.*)

Code construed: §§ 3112, 3454 (M. & V.) ; §§ 2274, 2760 (T. & S.)

7. SAME.  *Of seven years for protection of decedent's estate.*

The statute of limitations of seven years for protection of decedents' estates begins to run from the date of the accrual of the creditor's right to sue, and not from date of administration, where the cause of action accrued in decedent's lifetime, but the right to sue thereon accrued after his death. (*Post, pp. 617–621.*)

Code construed: §§ 3119, 3483 (M. & V.) ; §§ 2281, 2786 (T. & S.).

Cases cited and approved: Smith *v.* Goodlett, 92 Tenn., 232 ; Fitzsimmons *v.* Johnson, 90 Tenn., 441 ; Henderson *v.* Tipton, 88 Tenn., 258 ; Henry *v.* Mills, 1 Lea, 153; Caplinger *v.* Vaden, 5 Hum., 629 ; Reeves *v.* Pulliam, 7 Bax., 119 (S. C., 9 Bax., 153, and 1 Leg. Rep., 236) ; Moses *v.* Bank, 1 Lea, 404 ; Marr *v.* Bank, 4 Lea, 593.

---

FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

ROBERT L. MORRIS for Jones.

STOKES & STOKES, GRANBERY & MARKS, STEGER, WASHINGTON & JACKSON for Whitworth.

VERTREES & VERTREES for Killebrew.

CALDWELL, J.  On June 5, 1882, the Rockdale Manufacturing Company was incorporated under Sec. 11, Ch. 142, Acts of 1875, and, at a meeting of its directors, on June 9, 1882, the capital stock of

the company was fixed at $250,000, in equal shares of $100 each. On the latter day, James Whitworth and five other directors subscribed jointly for $135,-000 of the capital stock, and conveyed to the company about 5,742 acres of land, in payment of their subscription.

The corporate name of the company was changed in August, 1889, after which time it was known, and did business, as the Rockdale Mining & Manufacturing Company, with it principal business office at Nashville, Tennessee.

During the year 1889, the company executed first mortgage coupon bonds to the amount of $100,000, and issued $59,800 of its unsubscribed stock to J. B. Killebrew. In the course of its business, in 1891, the Rockdale Mining & Manufacturing Company became indebted to insolvency, and, on November 17 of that year, made a general assignment of its property for the benefit of creditors. September 4, 1894, the assignee filed this bill, at the instance of unsatisfied creditors, alleging the insolvency of the company and the exhaustion of its property in the payment of debts, and seeking recoveries against the joint subscribers for the $135,000 of stock heretofore mentioned, and against J. B. Killebrew. The bill was dismissed on demurrer, and the assignee has appealed.

1. The statute under which the company was incorporated provides, among other things, that "nothing but cash shall be taken in payment of the capital

stock, or land at a fair cash valuation.'' With this provision in view, complainant alleged in his original bill that the aforesaid 5,742 acres of land were ''not conveyed [to the company] at a fair cash value, but very far in excess of it;'' and upon this allegation he prayed for a money decree against the vendors for the difference between the par value of the $135,000 of stock, and the real value of said land.

This part of the bill was demurred to as not presenting a good cause of action, because it did not allege a fraudulent and intentional overvaluation of the land. The demurrer was sustained by the Chancellor, with leave to the complainant to cure the supposed defect by an amendment, which was done at once. Thereafter, the bill, as amended, was dismissed upon other grounds of demurrer, which will be considered hereafter in detail. Not being sure that he can prove an intentional and fraudulent overvaluation, complainant, on appeal, asks this Court to decide that his original allegation presented a good cause of action, and that the Chancellor erred in holding that it did not.

We think that the original allegation was not altogether sufficient. A ''fair cash valuation'' is such a price as honest and impartial men would naturally and reasonably place upon any given piece of property in view of its useful capabilities and the end to be accomplished by its sale and purchase. The same piece of property has different values at dif-

ferent times, and in different situations; it will command one price when desired for one purpose, and another price when desired for another purpose; and about all these fair-minded men may honestly entertain a wide difference of opinion. Hence, it is not a sufficient impeachment of the *bona fides* of a sale and purchase of land, which vendor and vendee were competent to make, for the pleader to say, without more, and in general terms, that the land was "not conveyed at a fair cash value, but very far in excess of it." The impeaching language is too general. It does not give the Court that degree of information requisite as the basis of a decree annulling and setting aside a transaction authorized by law and regular upon its face. The question of value, as already stated, is one about which honest and impartial men may differ; consequently, the complaining party must do more than merely assert his own opinion of the transaction in his bill.

This Court said, upon ample authority, in the late cases of *Kelley Bros.* v. *Fletcher, ante, p.* 1, and *Shields* v. *Clifton Hill Land Co., ante, p.* 160, that "it is plain law that a contract whereby a corporation receives needed property in the payment of stock subscription, is presumed, in the first instance, to be valid and binding upon all parties concerned; and that it must stand as made, and operate as intended, until impeached by appropriate pleading and proof." What would be "appropriate pleading" was not decided, because in those cases the allega-

tion was one of nonpayment, and not one of payment in property at an overvaluation.

2. We think the true rule is, and should be, that creditors of an insolvent corporation, or its assignee for the benefit of corporate creditors, can have relief against a stock subscriber who has paid his subscription in property which the corporation was legally authorized to buy, only upon allegation and proof that the property was sold at an overvaluation which was intentionally fraudulent, or which was so gross as to be constructively fraudulent, as against corporate creditors. The bill should allege facts making a case of actual or constructive fraud. *Phelan* v. *Hazard*, 5 Dillon, 50; *Clow* v. *Brown*, 31 N. E. R., 362; *Coit* v. *Amalgamating Co.*, 119 U. S., 345; *Coffin* v. *Ransdell*, 110 Ind., 417; *Gogebec Inv. Co.* v. *Iron Chief Min. Co.*, 78 Wis., 427 (S. C., 23 Am. St. Rep., 419–421); *Elyton Land Co.* v. *Birmingham W. & E. Co.*, 92 Ala., 407 (S. C., 25 Am. St. Rep., 82, 83).

3. One ground of demurrer upon which the bill, as amended, was dismissed, was that said bill did not show or allege that those for whose benefit the suit was brought were subsequent creditors—that is, creditors whose debts were created after, and not before, the subscription for the $135,000 of stock was made. The action of the Chancellor in this behalf was erroneous. It is true that; what is known in the books as the "trust fund doctrine," that through which complainant seeks relief in this case, had its

origin in, and is generally sustained upon, the idea
of actual or presumed reliance of the creditor upon
the capital stock of the corporation as security for
his debt at the time it was created (*Wood* v. *Dum-
mer*, 3 Mason, 308; *Adler* v. *Manufacturing Co.*, 13
Wis., 60; *Allen* v. *Railroad Co.*, 11 Ala., 437;
*Wetherbee* v. *Baker*, 35 N. J. Eq., 501; *Sawyer* v.
*Hoag*, 17 Wall., 611), and that, as a consequence,
antecedent creditors, who could have had no such re-
liance, cannot successfully invoke the rule. *First
National Bank* v. *Gustin Minerva Con. Min. Co.*,
42 Minn., 327 (S. C., 18 Am. St. R., 516); *Hand-
ley* v. *Stutz*, 139 U. S., 436; *Hospes* v. *N. W.
Manufacturing Co.*, 48 Minn., 174 (S. C., 31 Am.
St. R., 646); *Shields* v. *Clifton H. L. Co., ante*,
p. 123. But in this State, since 1875, the ques-
tion is controlled by general statute, whose language
is as follows: "The amount of any unpaid stock due
from a subscriber to the corporation shall be a fund
for the payment of any debts due from the corpora-
tion; the transfer of stock by any subscriber does
not relieve him from payment, unless his transferee
has paid up all or any of the balance due on said
original subscription." Acts 1875, p. 237, Ch. 142,
Sec. 5; M. & V. Code, § 1708. "What does this
mean? What is made a fund for the payment of
debts? 'Any unpaid stock.' What debts are con-
templated? 'Any debts due from the corporation.'
'Any unpaid stock' means all unpaid stock, and 'any
debts due from the corporation' means all debts due

39—10 P

from the corporation—that is to say, all unpaid stock shall be a fund for the payment of all debts of the corporation. No subscriber for unpaid stock can escape liability, and no corporate debt shall go unpaid, so far as the capital stock is concerned. The liability attaches to all subscribers; the security extends to all creditors. No subscriber whose stock remains unpaid can escape liability, and no creditor who has a valid debt can be denied his security. Nothing is said in the statute with respect to the time the subscription shall be made, nor as to the time the debts shall be created. No limitation is made in either case. The clear and plain meaning of the statute is, that all unpaid stock, whenever subscribed, shall be a fund for the payment of all corporate debts, whenever created." *Shields* v. *Clifton Hill Land Co., ante,* p. 158.

4. The four of the six subscribers for the $135,-000 of stock, who are living, demurred to the bill, as amended, because it showed upon its face that the conveyance of the land for the stock occurred more than six years, and more than ten years, before the commencement of this suit, and that the right of action alleged was, therefore, barred by the statutes of limitation of six and of ten years.

This ground of demurrer was also erroneously sustained. The bill does show, as already stated, that the transaction complained of took place on June 9, 1882, and that this suit was not commenced until September 4, 1894—more than twelve years there-

after; nevertheless, it does not present a case in which the right of action alleged was barred by either of the statutes relied upon. That right of action did not accrue when the deed was made, nor until the corporation became insolvent, and made its general assignment, on November 17, 1891; and, of course, the statutes of limitation did not begin to run in favor of these demurrants until the accrual of the right of action against them, which was, at most, less than three years before this bill was filed. The theory of the bill is, that, by reason of the fraudulent overvaluation of the land, the subscribers for the $135,000 of stock are chargeable, as for so much unpaid stock, with the difference between the par value of the stock and the real value of the land; and that is the case intended to be met by the demurrer. The statute of limitation begins to run in favor of a subscriber for unpaid stock only when a call is made, either by the directors or by a Court of Equity; or when the insolvency of the corporation is established, either by a general assignment or by a judgment and return of *nulla bona.* Wood Lim. Ac., Sec. 149; Waite on Insl. Corp., Sec. 631; 2 Spelling Pri. Corp., Sec. 826; Cook on S. & S., Sec. 195; *Moses* v. *Ocoee Bank,* 1 Lea, 404; *Marr* v. *Bank of West Tennessee,* 4 Lea, 593; *Scoville* v. *Thayer,* 105 U. S., 143; *Thompson* v. *Reno Savings Bank,* 3 Am. St. R. (note), 8, 29, 30; *Ib.,* 881.

In the present case no call is alleged ever to

have been made, either by the directors of the
company or by a Court of Equity, and no creditor
is shown to have obtained a judgment and return
of *nulla bona*, so as thereby to put the statute in
operation. The only thing alleged that would have
given the corporate creditors, or the assignee for
them, a right to sue the stock subscribers person-
ally is the insolvency of the corporation and the
consequent general assignment of all the corporate
property; and that is alleged to have occurred on
November 17, 1891, only about two years nine and
a half months before this suit was brought. This
right of action accrued, and the statutes of limita-
tion began to run, in favor of the defendants on
that day, but not sooner; hence, the suit is not
barred by either the ten or the six years statute.

5. It is well to observe that the bill, though
proceeding upon that theory, does not present the
ordinary case of unpaid subscriptions to capital stock.
Complainant does not allege a money subscription
partly paid in cash, nor a money subscription paid
in property at a fraudulent overvaluation. He al-
leges a subscription for "one hundred and thirty-
five thousand dollars of the capital stock of said
company, payable in iron lands conveyed to them
by deed of W. J. Whitthorne;" and that, "pur-
suant to said subscription," the subscribers referred
to conveyed those lands to the company in payment
of the stock. The charge is not that money was
subscribed, but that lands were subscribed, and that

lands were paid as subscribed, though at a fraudulent overvaluation.

We have found no case with similar facts, in which the statute of limitation has been considered with respect to the rights of corporate creditors. When the statute begins to run against such creditors, where the subscription was made in property, and paid as made, though at a fraudulent overvaluation to their injury, is a question that appears to be *res integra.* Yet, the solution of the question would seem to be clear and easy upon principle. In this aspect of the bill, as well as in that first considered, the statute of limitation would hardly begin to run against corporate creditors, or against the assignee suing for their benefit, until they acquired a right to sue the subscribers. That right did not and could not accrue so long as the company continued solvent. It did not accrue on June 9, 1882, when the fraud is alleged to have been committed, but on November 17, 1891, when the company became insolvent and assigned its property. No corporate creditor has a right of action against subscribers for unpaid stock, in whatever form, or for any other liability to the corporation, while it is a going concern, and able to pay all of its debts as they mature. Such right of action accrues to the creditor only when insolvency occurs to the corporation, and the statute of limitation can, in no case, begin to run against him before that time. He must have a right to sue before he can be barred.

6. Whether the facts alleged in the bill, if established by the proof, will justify the specific relief therein sought, or will only warrant a rescission, is not clear from the authorities. The former view is ably maintained in the well-considered case of *Elyton Land Co.* v. *Birmingham W. & E. Co.*, 92 Ala., 407 (S. C., 25 Am. St. R., 65–83). That question, however, is not made by any of the demurrers in this case, and, therefore, cannot be authoritatively decided at this time.

7. R. H. Gardner and W. H. Evans, the other two subscribers for the $135,000, died several years ago, and administration was duly granted upon their estates December 24, 1883, and May 14, 1884, respectively; and their personal representatives are sued in this case, in connection with the four surviving subscribers.

The administrators of Evans demurred to the bill, and in their demurrer claimed that complainant's suit, as to them, was barred by the statute of limitation of two years. This ground of demurrer was properly sustained.

The statute relied on had its origin in Sec. 4, Ch. 23, Acts of 1789, whose language was as follows: "That the creditors of any person or persons deceased, if he or they reside within this State, shall, within two years, and, if they reside without the limits of this State, shall, within three years, from the qualification of the executors or administrators, exhibit and make demand of their respective accounts,

debts, and claims of every kind whatever to such executors or administrators; and if any creditor or creditors shall hereafter fail to demand and bring suit for the recovery of his, her, or their debt as above specified, within the aforesaid time limited, he, she, or they shall forever be debarred from the recovery of his, her, or their debt in any Court of Law or Equity, or before any Justice of the Peace, within this State; *Provided*, That nothing in this Act shall extend to debar infants, persons *non compos*, or *femes covert* to bring their several actions after the expiration of the term above mentioned, provided such actions be brought within one year after the coming to lawful age, sound mind, or discoverture of such persons; *Provided also*, That, if any creditor who, after making demand of his debt or claim, shall delay to bring suit at the special request of the executors or administrators, that then and in that case the said debt or demand shall not be barred during the time of the indulgence." 1 Scott's Laws of Tenn., pp. 410, 411.

This provision, though not in terms so stating, was clearly intended to embrace "accounts, debts, and claims" not due at the time of the qualification of the executor or administrator, as well as such as were due at that time; the specified period of limitation to begin, however, at that date as to those then due, and at the date of their maturity as to those subsequently maturing. *Bradford* v. *McLemore*,

3 Yer., 319; *Trott* v. *West*, 9 Yer., 436; *Atkinson*
v. *Brooks*, 10 Yer., 485.

It was made the basis of two sections of the
Code of 1858; one of those sections appearing in
the article relating to the "limitation of suit against
personal representatives," and the other appearing in
the article relating to the "limitation of actions
other than real." The former, which like the
original act fails to distinguish between, and to
specifically include debts not due and debts due at
the time of the .qualification of the personal repre-
sentative, is as follows: "The creditors of deceased
persons, if they reside within this State, shall within
two years, and if without, shall within three years,
from the qualification of the executor or administrator,
exhibit to them their accounts, debts, and claims,
and make demand and bring suit for the recovery
thereof, or be forever barred in law and equity."
Code, § 2279. And the latter, which, following the
previous judicial construction, clearly makes that dis-
tinction and inclusion, is in these words: "Actions
against the personal representatives of a deceased
person shall be commenced by a resident of the
State within two years, and by a nonresident within
three years after the qualification of the personal
representative, if the cause of action accrued in the
lifetime of the deceased, or, otherwise, from the
time the cause of action accrued." Code, § 2784.

Under either or both of these sections, as under
the original act, the period of limitation begins only

when two things concur—(1) there must be a personal representative capable of being sued, and (2) there must be a creditor with a present right to sue.

The administrators of Evans were qualified in May, 1884, as already stated, but this statute did not begin to run against complainant at that time, because he did not then have a right to sue. His right of action did not accrue, and, consequently, the statute was not put in motion, until the company made its general assignment in November, 1891. This latter date, however, was two years nine and a half months before the commencement of this suit on September 4, 1894; hence, the bar of the statute is complete.

8. The first six months after their qualification, during which suit could not have been maintained against the administrators of Evans (Code, § 2274), and during which the two years statute did not begin to run in their favor (Code, § 2760), expired long before this cause of action accrued; and, as a consequence, that period is not to be subtracted from the time elapsing between the accrual of the action and the commencement of the suit.

9. The personal representatives of both Evans and Gardner demurred to the bill, and relied upon the statute of limitation of seven years as a bar to complainant's action. This demurrer was erroneously sustained as to both estates.

It has been truly said in many cases that the seven years statute in favor of the estates of dead men establishes a positive prescription, not only bar-

ring the remedy, as do the ordinary statutes of limitation, but actually extinguishing the right of action (*Smith* v. *Goodlett*, 92 Tenn., 232; *Fitzsimmons* v. *Johnson*, 90 Tenn., 441; *Henderson* v. *Tipton*, 88 Tenn., 258, and other cases. in those cases cited); but we are not aware that it has ever been held to operate to the extinguishment of a right of action that did not accrue full seven years before the commencement of the suit, and we do not think it open to such a construction in any case. "The Legislature could never be held to intend, unless they said so in so many words, that a person should be barred of his action before the right to sue had accrued." *Henry* v. *Mills*, 1 Lea, 153.

The seven years statute · in question comes from Section 9, Chapter 48, Acts of 1715, which provides "that creditors of any person deceased shall make their claim within seven years after the death of such debtor; otherwise such creditor shall be forever barred." 1 Scott's Laws of Tenn., p. 33.

In the year 1843 this Court held with respect to that statute, as it had previously held as to the two and three years statute just considered, that the contemplated period of limitations related alike to debts due and to debts not due at the death of the decedent, but that it began to run, as to the latter class of debts, only when the creditor had a right to sue—when his cause of action accrued—though that might be long after the death of the testator or intestate. *Caplinger* v. *Vaden*, 5 Hum., 483.

Fifteen years after that holding the seven years statute was also carried into the Code in two separate sections (2281 and 2786), one into each of the two articles in which the two and three years statute appears. Section 2281 includes the first proviso of Section 4, Chapter 23, Acts of 1789, and likewise the seven years statute as judicially construed by this Court fifteen years before the adoption of the Code. Its language, with subdivisions and their origin indicated, is as follows: "Infants, persons of unsound mind, and married women may bring their several actions within one year after the removal of their respective disabilities, notwithstanding the lapse of said periods of two and three years [Acts 1789, Ch. 23, Sec. 4, first proviso], so that suit be brought within seven years after the death of the debtor, if the cause of action accrued in his lifetime, or, otherwise, within seven years from the time the cause of action accrued." Acts 1715, Ch. 48, Sec. 9, as construed in *Caplinger* v. *Vaden*, 5 Hum., 483.

Section 2786 embodies neither that proviso nor that judicial construction, but contains substantially the same language as that originally employed in Section 9, Chapter 48, Acts of 1715, and is as follows: "But all actions against the personal representatives of a decedent, for demands against such decedent, shall be brought within seven years after his death, notwithstanding any disability existing, otherwise they will be forever barred."

Why the codifiers should have included the judicial construction of the Act of 1715, as announced in *Caplinger* v. *Vaden*, *supra*, in § 2281 of the Code, and not in § 2786, it is not easy to understand; but, whatever the reason may have been, the two sections have the same meaning, as we understand them, the former carrying its own interpretation upon its face, and the latter leaving the interpretation to the Courts; and, whether construed together as parts of the same general law, or separately, the conclusion seems to us inevitable that the contemplated period of seven years cannot begin under either until the creditor's right of action accrues, whenever that may be. If the cause of action accrue in the lifetime of the debtor, the statute begins to run at the time of his death, and if the cause of action accrue after his death, the statute begins to run at the time of the accrual of the action. Section 2281 so declares in express terms, and § 2786 has the same meaning, when subjected to the rule of construction applied to the original act in *Caplinger* v. *Vaden*, *supra*. Indeed, § 2786 was itself so construed in *Reeves* v. *Pulliam*, 1 Leg. R., 236 (S. C., 7 Bax., 119, and 9 Bax., 153), upon the authority of that case, and to same effect are 1 Lea, 404, and 4 Lea, 593.

It has been seen already that the cause of action here sued upon did not accrue until November 17, 1891, from which it follows that, notwithstanding Gardner and Evans died more than ten years before

the commencement of this suit, the seven years statute of limitation is no protection to their estates.

If Gardner and Evans had executed their promissory note to A. B. on the ninth of June, 1882 (when the deed was executed to the company), to become due and payable on the seventeenth of November, 1891 (when the company made its general assignment and corporate creditors for the first time became entitled to sue the subscribers upon the present cause of action), that note would not have been barred by the seven years statute of limitation on the fourth of September, 1894 (when this suit was commenced), though both of them had been dead more than ten years at that time. In that case, as in the one at bar, that statute would have begun to run when the cause of action accrued, and not when Gardner and Evans died. A creditor cannot be barred for not suing when he has no right to sue. The statute operates against present and not against future rights of action.

It was distinctly decided in the cases of *Moses* v. *Ocoee Bank*, 1 Lea, 404, and of *Marr* v. *Bank of West Tennessee*, 4 Lea, 593, that the statutes of limitation would not begin to run in favor of the personal representatives of deceased stockholders, in suits for the collection of unpaid stock, until the stock had become due and the right to sue for non-payment had been matured by a proper call for a payment of the stock.

10. Upon the allegation that the Rockdale Mining

& Manufacturing Company issued to J. B. Killebrew
$59,800 of its unsubscribed capital stock, "as com-
pensation for his services in negotiating the sale of"
$85,000 of its first mortgage coupon bonds, com-
plainant seeks to charge him "with so much of the
said stock, at a cash valuation, as may be a proper
*pro rata* from him to satisfy unpaid debts of the com-
pany." Killebrew demurred to this part of the bill
because it did not allege that the compensation re-
ceived by him was unreasonable for the services ren-
dered, nor that the transaction whereby he obtained
the stock was fraudulent. This assignment of de-
murrer was well made, and was properly sustained.
The allegation against Killebrew is wholly insufficient
to charge him with liability for any sum. Were it
alleged that he subscribed for the $59,800 of stock,
thereby binding himself to pay that amount of money,
and that he was allowed to pay the subscription and
discharge that liability by rendering the services men-
tioned, there would be a case against him; for the
liability so discharged would be so greatly out of
proportion to the benefit bestowed as to justify the
legal inference of bad faith and fraud. It could not
be true that a man would earn $59,800 by simply
negotiating the sale of $85,000 of bonds. But that
is not the case made in the bill. There is no alle-
gation that Killebrew had subscribed for the stock,
or that he owed the company for it; nor is there
any statement in the bill as to the value of the stock.
In other words, there is no charge of undervaluation

of the stock nor of overvaluation of Killebrew's services, nor any statement from which either can be reasonably inferred. For aught the Court knows from the bill, the stock may have had very little or no market value; and taking the stock as he seems from the language of the bill to have done, he could in no event have been liable for more than its market value; unless, indeed, he bound himself by contract to pay more than that for it. The law fixed no liability upon him as a mere purchaser, and not a subscriber, to pay the par value of the stock.

Modify as indicated in this opinion, and remand for further proceedings.

---

#### NOTE OF DISSENT.

WILKES, J. I do not concur in the first rule laid down by the majority, and for the grounds of my nonconcurrence refer to my dissent in the case of *Shields* v. *Clifton Hill Land Company et al.* On all other questions presented and decided I concur.