L. L. AIKEN, et al., v. GALYON-CRUMLEY LUMBER CO., etl.

Eastern Section.　January 9, 1926.

Certiorari denied by Supreme Court April 5, 1926.

1. **Corporations. Stock subscriptions may be paid for in property.**
　　In a creditor's bill to compel certain stockholders of an insolvent corporation to pay cash for their stock subscriptions, held where subscriptions are not stipulated to be payable in cash, they may be paid in property.

2. **Frauds, Statute of. Statute of frauds cannot be pleaded collaterally by third party.**
　　The Statute of Frauds cannot be pleaded collaterally by a third party after the contract has been executed.

3. **Evidence. Evidence contradictory to that in a former trial admissible.**
　　Statements in a former trial will not estop a party from proving the truth, if he can show they were made inconsiderately, by mistake, or without full knowledge of the facts.

4. **Corporations. Contract of subscription held not to bind parties to pay cash.**
　　In an action by creditors of an insolvent corporation to compel certain stockholders to pay cash for their stock when contract of subscription said nothing about how stock was to be paid, held not to require cash payments.

5. **Evidence. Evidence tending to prove case in chief not admissible in rebuttal.**
　　In an action by creditors of an insolvent corporation to compel stockholder to pay cash for their stock where it was alleged that the property with which they paid for their stock was worthless a deposition tending to show property had no value was not admissible in rebuttal it being a part of the case in chief.

Appeal from Chancery Court, Polk County; Hon. T. L. Stewart, Chancellor.

Affirmed.

J. E. Adams and Joe V. Williams, of Chattanooga, for plaintiff in error.

Cates, Smith, Tate and Long, of Knoxville, for defendant in error.

HEISKELL, J.　This suit was filed by and on behalf of the general creditors of the Galyon-Crumley Lumber Co. and the bill has been sustained as a general creditors' bill. Eugene Galyon, Albert Crumley and C. W. Kiker were made parties defendant and complainant sought as against each of them a judgment for ten thousand dollars ($10,000) alleged to be due on subscriptions made by each of said parties to the capital stock of the Galyon-Crumley Lumber Co.

Judgments were also sought against these same parties on various other alleged grounds of mismanagement, etc., but as the result of demurrers interposed to the bill, the only ground of liability re-

maining for assertion against these three defendants on the trial of the case was their failure to pay their subscriptions for capital stock.

Before the case came on for trial the suit was dismissed as to C. W. Kiker.

Upon a hearing the chancellor dismissed the bill as to Eugene Galyon and Albert Crumley in a decree adjudging that the capital stock subscribed for, by and issued to Albert Crumley, Eugene Galyon and C. W. Kiker had been fully paid for by the transfer of certain partnership assets, including a lease from the United States government on the Smith Creek Reservation; and that the corporation, Galyon-Crumley Lumber Company, which was organized for the purpose of taking over and operating this particular lease, had accepted it in exchange for the capital stock issued to Galyon, Crumley and Kiker and had enjoyed all of its benefits. And that there was no fraud or over-valuation of the assets transferred by Galyon-Crumley and Kiker to Galyon-Crumley Lumber Co. in exchange for thirty thousand dollars ($30,000) of its authorized capital stock of fifty thousand dollars ($50,000).

Complainants have appealed and assigned errors. It is not considered advisable to set out the assignments in full, but such parts of them as are considered material will be taken up and disposed of.

The complainants' bill predicates the right of the creditors to recover upon a certain contract spread upon the minutes of the said defendant corporation, viz:

"Upon motion, duly made and seconded, it was voted that the books of the corporation be declared open for subscription to the capital stock of the company, and the parties set out below subscribed for the number of shares, and for the amounts set opposite their respective names, to-wit:

| Name. | No. of Shares. | Amount. |
| --- | --- | --- |
| Eugene Galyon | 100 | $10,000.00 |
| Albert Crumley | 100 | 10,000.00 |
| C. W. Kiker | 100 | 10,000.00 |
| C. S. Lord | 1 | 100.00 |
| W. F. Loflin | 1 | 100.00 |

There was no denial of these subscriptions, but the defense was that Galyon, Crumley and Kiker had a private agreement that they would pay for the stock by transferring their interest in the South Creek lease."

This Smith Creek lease, as it was called, was a license permit from the Federal government issued originally to a partnership, Froneberger & Crumley. This partnership fell into financial difficulties and Froneberger withdrew from it and Crumley took over the business. Then Galyon and Kiker advanced money to Crum-

ley to enable him to hold this lease or license, and an agreement was entered into to form a partnership to operate under same and carry on the lumber business, using the timber secured by virtue of said lease, and as a part of said transaction it was agreed between Galyon, Kiker and Crumley that each should have a one-third interest in said lease and that this should pay for the $30,-000 of stock for which they subscribed. This matter was taken up with the representative of the government and it was agreed that the defendant corporation should have the use and benefit of said lease or license. The proof shows these facts. The further discussion and finding of facts will be disposed of in connection with the assignments of error.

The first assignment of error is that the court erred in not holding Galyon and Crumley liable because they had not paid their stock subscription in cash. These subscriptions were not stipulated to be payable in cash and, therefore, could be paid in property. This is treated further under the fifth assignment.

The second assignment is that the court erred in holding that said defendants could and did pay their stock subscriptions with their interest in the Smith Creek license or lease from the U. S. government, giving the right to cut timber on government land:

(a) Because there was no corporate action authorizing or ratifying said payment.

This is more technical than real. It was part of the agreement upon which the corporation was formed and was agreed to by corporate action in reality, if not formally.

(b) Because the transfer of said license was not in writing. The answer to this is, that the Statute of Frauds cannot be pleaded in this way collaterally by a third party after the contract has been executed.

(c) Because the estimate of value of $30,000 placed on said license was fictitious and fraudulent. This presents a question in the case which will be discussed further on herein.

The third assignment seeks to put the chancellor in error because he declined to hold Galyon estopped by his former testimony in the case of Albert Crumley v. Galyon-Crumley Lumber Company, in the chancery court at Benton. The chancellor merely applied the rule laid down in Tate v. Tate. "But such statements will not estop the party from proving the truth, if he can show they were made inconsiderately, by mistake, or without full knowledge of the facts." Tate v. Tate, 126 Tenn., 212.

And the same ruling was made by Judge Hall in passing upon the same question in the case of Galyon v. King. If this latter is not the law of the case on this point, it is at least an authority based on the same state of facts.

. The fourth assignment of error is similar to the second and fifth, in that it denies the right of the subscribers to pay for their stock in property. See authorities cited under the fifth assignment of error in this opinion.

The fifth assignment covers the same ground as preceding assignments, in a different form. That is, that it was error to admit evidence of the agreement between Galyon, Crumley and Kiker, in regard to the value of the government license, and the payment of their stock subscriptions with said license. Counsel for appellants seems to hold the opinion that the contract of subscription bound these parties in writing to pay for their stock in cash, and nothing but cash. We do not so read the subscription. It was an ordinary subscription for so much stock, with nothing said as to manner of payment. Therefore, the rule applies,

"Property needed by the company may be taken at a fair valuation in payment of stock subscription. . . . It is plain law, that a contract whereby a corporation receives needed property in the payment of stock subscription, is presumed, in the first instance, to be valid and binding upon all parties concerned; and that it must stand as made, and operate as intended until impeached by appropriate pleading and proof." Shields v. Clifton Hill Land Co., 94 Tenn., 160-161.

In Kelly v. Fletcher, 94 Tenn., 6, the court said: "It is quite as well settled that the subscriber may pay and satisfy his stock subscription either in money or in such property as the corporation may need, and agree to take, in good faith and at a fair valuation; and, if the property is taken at a fair valuation and in good faith, the payment is as effectual and as valid as though made in cash to the same amount. Cook on S. & S., secs. 18-20, 423; 1 Morawetz, 425; Searight v. Payne, 6 Lea, 284, 285; Albitztigui v. Gaudalupe, etc., Mining Co., 119 U. S., 343; Coffin v. Ransdell, 110 Ind., 417 (S. C., 16 Am. & Eng. Corp. Cases, 432); Thompson on Liability of Shareholders, sec. 134; Taylor on Private Corporations, sec. 545; 2 Spelling on Private Corporations, sec. 292; 35 N. J. Eq., 501.

"In the case before us it is amply shown that the property assigned by Lambie and received by the Hercules Marble Co., in payment of his stock subscription, was such as the corporation needed in the operation of its business, and, consequently, such as it had the legal right to purchase. About this there can be no dispute, upon this record, and beyond this there is no proof before the court with respect to the value of that property.

"It having been lawful for Lambie to sell, and for the corporation to buy such property as he assigned in payment of his

stock, and they having exchanged one for the other, we can see no good reason why their contract in that behalf should not be binding upon all parties concerned or affected thereby, so long as it remains unimpeached. Nothing appearing to the contrary, the law presumed the contract to have been made in good faith, and the property of Lambie to have been sold and bought at a fair valuation; and when the defendants established the fact of the contract and its terms, without more, they thereby made a prima-facie case of valid payment by Lambie.

"The parties having been competent, under the law, to contract with each other with respect to the matter before them, they are presumed to have done what they had a legal right to do, rather than what they had no legal right to do."

What is a fair cash valuation is discussed in Jones v. Whitworth, 94 Tenn., 602, as follows: "A 'fair cash valuation' is such a price as honest and impartial men would naturally and reasonably place upon any given price of property, in view of its useful capabilities and the end to be accomplished by its sale and purchase. The same piece of property has different values at different times, and in different situations; it will command one price when desired for one purpose, and another price when desired for another purpose; and about all these, fair-minded men may honestly entertain a wide difference of opinion. Hence, it is not a sufficient impeachment of the bona fides of a sale and purchase of land, which vendor and vendee were competent to make, for the pleader to say, without more, and in general terms, that the land was 'not conveyed at a fair cash value but very far in excess of it.' The impeaching language is too general. It does not give the court that degree of information requisite as the basis of a decree annulling and setting aside a transaction authorized by law and regular upon its face. The question of value, as already stated, is one about which honest and impartial men may differ; consequently, the complaining party must do more than merely assert his own opinion of the transaction in his bill."

If this stock could not be paid for with anything but money, of course the agreement would amount to nothing; but if payment in property is not illegal, we cannot see why it is not competent to prove an agreement to do so.

The sixth assignment insists that it was an abuse of the chancellor's discretion to refuse to allow complainants to introduce depositions in rebuttal, tending to show that the government license permit had no value.

This testimony bore on the question of fraud so amply charged in the original bill. Counsel for complainant was notified early in the

trial that the burden was on complainant to make out these charges of fraud. The bill charges the very thing it was sought to prove by this rebuttal testimony. It was necessary for complainants to show that their charges of fraud were true, that the value put upon this government license was fictitious, false and fraudulent, in order to defeat the payment of the stock and sustain a recovery against the stockholders for unpaid subscription. The testimony offered in rebuttal was properly testimony in chief. Notice to this effect was served on complainants by the chancellor and by the allegations of their own bill. The action of the chancellor cannot be said to be an abuse of his discretion.

The only question which seems to deserve further discussion is that raised under the first assignment of error, viz., was the estimate of value placed on the U. S. government license or permit of $30,000 fictitious and fraudulent, or was it made in good faith and believed to be a fair and honest valuation at the time the stock was treated as paid for.

At the time of its organization the Galyon-Crumley Lumber Co. took possession of the Smith Creek lease and all improvements thereon. This source of timber supply was needed by the corporation, in fact it was essential. The company began at that time in July, 1920, to use this lease or license and all improvements thereon and continued so to use the same until the general creditors' bill was filed in this cause on October 23, 1922. In June and July, 1920, lumber and logs were selling for peak prices, and there is every indication in the proof that the defendants expected to make a great deal of money and thought their government concession was of great value. In the fall of 1920 prices began to go down, and when this bill was filed conditions were very different from that of June and July, 1920, and no doubt the state of mind of those engaged in the lumber business was very different. Twenty-seven months is a long time in the history of a boom. It is more than time enough to travel from optimism to pessimism, from values, in good faith, exaggerated, to values sunk below intrinsic reality.

Kiker, Galyon and Crumley all testify that they considered the valuation fair and reasonable and that they had no intention of overvaluing these assets or of defrauding any creditor of the corporation by this transaction.

With the burden on the complainants to show the contrary, we are of the opinion that the weight of the evidence supports the testimony of the defendants. We hold, therefore, that all the assignments of error must be overruled and the decree of the lower court, dismissing the bill, affirmed.

Owen and Senter, JJ., concur.