H. L. GRIGSBY, Receiver of the Peoples Bank, v. C. J. AINSWORTH et al.

Western Section. November 28, 1930.

Petition for Certiorari denied by Supreme Court, April 4, 1931.

Maiden & Rowlett, of Martin, for appellant.

R. E. Maiden, D. W. Harper, J. W. Rankin and M. H. Biggs, all of Dresden, and L. C. Hannings, of Martin, for appellee.

SENTER, J. This litigation between the State Superintendent of Banks, in his capacity as Receiver of the Peoples Bank, of Martin, Tennessee, and the stockholders of said bank grows out of the liquidation of said bank in the Chancery Court of Weakley County. By the original bill and the several amendments thereto, the Receiver of the bank seeks to recover the unpaid stock sub-scriptions against the original subscribers and the transferees of original subscribers as assets necessary to pay the creditors of said insolvent bank.

It appears that the Peoples Bank was chartered by the State of Tennessee in 1908, with an authorized capital stock of $100,000 all of which was subscribed, but only 50% of the respective stock sub-scriptions paid in. It appears that this bank had a gradual growth in the matter of deposits and loans and discounts, and that during the years 1917 and 1918, and to some extent in 1919, which was a period of inflated farm values in Weakley County, the bank became the owner and holder of a considerable amount of farm loan paper. It further appears that about the beginning of the year 1920 a considerable decline in farm values began, and there was a general condition of deflation of values and considerable stringency of money matters and farm and farm product values. This resulted in considerable embarrassment and distress to the Peoples Bank.

and with the result that for a period of four or five years, the years 1920, 1921, 1922, 1923 and 1924, a comparatively small amount of new loans were made, but the bank officials were exerting efforts to collect and strengthen the security on loans secured by farm lands, and on notes representing deferred payments on farm lands. During these years the State Banking Department, through its examiners, and acting under the direction of the State Superintendent of Banks, had numerous conferences with the bank officials at the time examinations were made by the examiners, concerning the general condition of the bank and the securities held by the bank and the sufficiency of the security for loans represented by notes. We think there can be no doubt under the record but that the bank officials were seriously concerned about the condition of the bank, and realized that the bank must sustain losses on account of the deflation in values, and other financial conditions extant in the community, but entertained the hope that conditions would ultimately improve, which would greatly relieve the bank from its then embarrassed condition. In the latter part of the year 1924 matters had grown more serious and much correspondence passed between the President of the bank and the State Superintendent of Banks. The bank officials seemed reluctant to make a call on unpaid subscriptions to capital stock, but the State Superintendent of Banks, who had been reasonably indulgent, finally concluded that the bank would have to improve its condition, and wrote a letter to the bank officials suggesting how this could be accomplished. At that time, by direction of the state bank examiners, $30,000 had been charged off as losses. The State Superintendent of Banks suggested that there should either be a call made upon the stockholders on unpaid subscriptions sufficient to cure any impairment, and thereby put the bank in safe condition, or else reduce the capital stock from $100,000 one-half paid up to $35,000 or $25,000. Acting upon this suggestion the officials of the bank and the stockholders of the bank decided upon the latter course, and by resolution of the stockholders requested an amendment to the charter reducing the capital stock from $100,000 to $25,000. There is some question made as to the regularity of the proceedings which will be later referred to, but the charter was so amended and the capital stock was reduced to $25,000 and the old certificates taken up and new certificates issued to the holders of the old certificates on the basis and in the ratio of the old certificates, and the new certificates were marked fully paid. After this reduction was made the bank continued business. This reduction was made, or finally concluded on December 3, 1924, and on September 21, 1927, the Directors of the bank notified the State Superintendent of Banks to take charge of the bank, which was done and the usual petition was filed in the Chancery Court, alleging the

insolvency of the bank and that it had discontinued business and asking for the appointment of the State Superintendent of Banks as Receiver.

After the Receiver had been appointed and had taken charge of the liquidation of the bank under the orders of the Chancery Court, the affairs of the bank were found to be in bad condition, and that it was badly insolvent, with many preferred creditors, and other secured creditors secured by assets of the bank, leaving very little assets with which to pay general creditors. Whereupon, the bill was filed against the stockholders of the bank seeking to recover the unpaid 50% of subscriptions to the original capital stock to be used in paying creditors of the bank. The bill alleges that the reduction of the capital stock was fraudulently procured, and by false and fraudulent misrepresentations made to the State Superintendent of Banks, and that the statutory procedure had not been complied with, and that the subscribers to the original capital stock had not been legally and lawfully released from liability for the unpaid subscriptions to the original stock. The bill further alleges that in any event, the reduction of the capital stock could not operate to release subscribers and transferees from liability on the unpaid stock subscriptions as to creditors in existence at the time of the reduction of the capital stock. It being further contended by the complainant that the bank was hopelessly insolvent at the time the capital stock was reduced, and that by reducing the capital stock from $100,000 to $25,000 did not make the bank solvent, and that it continued insolvent all the time until the appointment of the Receiver in 1927; that the reduction of the capital stock in the way and manner that it was accomplished still left the bank insolvent, which fact was not known to the State Superintendent of Banks when he approved the application for a reduction of the capital stock, and therefore it constituted a constructive fraud, if not actual fraud, not only against existing creditors at the time the reduction was made, but subsequent creditors as well.

By reason of the numerous amendments to the original bill and a considerable amount of confusion in the pleadings, it is somewhat difficult to determine the exact issues ultimately made. The Chancellor has filed an elaborate opinion, and in which he refers to the confusion resulting from the numerous amendments, which seem to have been made without objection, and states that if he had realized just how numerous and confusing these amendments were he would have required the complainant to file an amended and supplemental bill so as to clarify the issues.

The defendants, who are stockholders or transferees of the original stock subscribers, have filed answers, and in which denial is made of any irregularity or any fraud, actual or constructive, in procur-

ing the reduction of capital stock from $100,000, 50% paid up, to $25,000, fully paid up. Denial is also made that the bank was insolvent at the time of the reduction of the capital stock. Denial is made of all the averments charging liability to stockholders on the unpaid subscriptions either for the benefit of existing creditors existing at the time of the reduction in capital stock, or subsequent creditors becoming creditors subsequent to the reduction.

These we consider to be the material questions presented for determination on this appeal. At the hearing of the cause, the Chancellor filed an elaborate written opinion which is contained in the record.

The Chancellor found and so decreed that the amendment to the charter was in substantial compliance with the law governing amendments and reduction of capital stock of corporations chartered in the state, and is sufficient to constitute a valid and effective amendment to the charter, and denied any relief sought on the ground that the amendment to the charter reducing the capital stock was wrongfully procured, and denied any relief on the allegations in the bill and amendments to the effect that the amendment to the charter authorizing the reduction of the capital stock was void. The court further held that it was immaterial whether the bank was solvent or insolvent at the time, before, or after the amendment to the charter reducing the capital stock. On this subject the Chancellor stated:

"It appears to the Court that the complainant is not entitled to the relief sought on the allegations contained in the bill and amendments thereto that the bank was insolvent before, at the time of the amendment, and has ever since been insolvent. It is wholly immaterial when the bank became insolvent even though the bank was entirely solvent before, and when the capital stock was reduced, that fact would not relieve subscribers against the claims of existing creditors. Creditors who have become such since the reduction of the capital stock have no right to look to the unpaid subscriptions. They must be held to have contracted upon the faith of the capital stock as it was after the reduction. While it is admitted that the bank was insolvent when it closed on September 21, 1927, yet the solvency or insolvency of the bank at the time the amended charter became effective, December 3, 1924, is immaterial as persons who became creditors of the bank after the reduction of its capital stock have no right to look to the unpaid capital as it existed before the capital stock was reduced for the payment of their claims, and persons who were creditors of the bank at the time the capital stock was reduced are entitled to look to said unpaid capital stock for the payment of their claims irrespective of the solvent or insolvent condition of the bank at the time its capital stock was reduced, all of which is accordingly adjudged and decreed by the court."

The decree further recites on the subject of what stockholders would be liable to existing creditors, and the order of liability, as follows:

"It appears to the court that all stock certificates issued by the bank before the reduction of its capital stock showed on their face that the capital was only one-half paid; that after the reduction the old certificates were cancelled and new fully paid certificates issued; that transfers of stock had made before the reduction; that transfers had been made since the reduction, and that some of the holders of stock had died. It is the opinion of the court that persons who became stockholders after the reduction of the capital stock are not liable in this cause in any event beyond the amount of the capital which has been paid in by them. It appears to the court that stockholders who owned stock in the bank at the time the capital stock was reduced, to-wit: December 3, 1924, and prior to that time, are liable to the existing creditors at that time. They are liable for the amount of that part of the claims of creditors of the bank in existence when the reduction was made in capital stock and that have not been and cannot be paid out of the assets of the bank. The amount of the claims of persons in existence at the time the bank's capital was reduced shall have deducted therefrom all payments made by the bank to them after the reduction of the bank's capital stock, and holders of stock on which only one-half had been paid, are liable to such creditors for whatever amount the assessts of the defendant bank lacks of paying the same, all of which is accordingly adjudged and decreed by the court.

"Persons who owned stock in the bank at the time of the reduction of its capital stock are primarily, after applying the amount that the assets of the bank will pay on the same liable for all amounts which creditors in existence at the time are entitled to be paid.

"The subscribers for the stock in the bank are liable for the unpaid capital for the payment of the debts due by the bank and their vendees and the subsequent vendees of said stock take it subject to this burden. If the person who owns stock at the time the bank's capital was reduced is insolvent and it cannot be made out of him or his estate, then the prior vendors would be liable for the same in the order in which the stock was owned. The heirs of the owners of stock are not liable for the unpaid amount due thereon but the personal representative is liable for the amount necessary to be paid for the discharge of such obligations of the bank as is necessary for a call to be made on the stockholders in order that said obligations be paid, all of which is accordingly adjudged and decreed by the court."

At this point in the decree it is stated that the Receiver and surety on his cost bond should pay all the cost which has accrued

incident to the filing of the amendments to the original bill. The other cost of the cause was not adjudged, the court stating that all the other cost is reserved until the coming in of the report on reference to be made to the Clerk and Master. The decree then directs an order of reference to the Clerk and Master on the following questions:

"1. Who were existing creditors on the 3rd day of December, 1924.

"2. The amount in which each is entitled to claim as an existing creditor.

"3. What portion of the claims of existing creditors will remain unpaid after the application of the corporate assets among all creditors.

"4. Who were the stockholders on the 3rd day of December, 1924, and whether they were original subscribers or transferees and the amount of shares held by each.

"5. What subscribers had transferred stock, and what number of shares prior to December 3, 1924.

"6. Any other transferees and the number of shares transferred prior to December 3, 1924."

To this decree the complainant filed numerous exceptions, and since these exceptions constitute the portion of the decree from which complainant has appealed we deem it material to set out the exceptions of the complainant, and since the defendant stockholders have appealed from a portion of the decree we will also set out the exceptions to the decree of the defendants, the Chancellor having stated that he would grant an appeal to either party at this stage of the proceedings, and before the Master complied with the order of reference. The exceptions of complainant are as follows:

"1. He excepts to that part of the judgment of the court which adjudicates that he and his surety on his cost bond shall pay that part of the cost of this cause which accrued by reason of the filing of the amendments to the bill herein.

"2. He excepts to that part of the judgment of the court which holds that the amendment procured to the bank's charter was made substantially in compliance with the law and was valid and sufficient on its face to constitute a reduction in the bank's capital stock.

"3. He excepts to that part of the judgment of the court which holds that the application made by the bank to the Superintendent of Banks, after the amended charter was obtained, for permission to make such amended charter effective and to reduce the capital stock of the bank, was good, valid, and in compliance with the law relative thereto, and he further excepts to the holding of the court that the certificate granted by the Superintendent of Banks on said applica-

tion was good and valid and that said attempted reduction of capital stock was in fact made as required by law.

"4. He excepts to the judgment of the court in holding that the solvent or insolvent condition of the bank at the time it reduced its capital stock was immaterial insofar as it affected the validity of the amended charter and the right of the bank to secure said a-mended charter and to have it put in effect in the condition in which it was at that time.

"5. He excepts to the judgment of the court in holding that said amended charter procured by the bank was good, valid and effective as to subsequent creditors; and he further excepts to the holding of the court that the bank had the right to obtain such an amended charter at the time it did and on the conditions it was operating at that time.

"6. He excepts to the judgment of the court in failing to hold that the defendant bank was wholly insolvent at the time it procured its amended charter and had no right to procure such amendment and release the stockholders from the obligation to pay the unpaid capital stock.

"7. He excepts to the judgment of the court in holding that creditors of the bank, at the time the reduction of the capital stock was made, must have deducted from their claims in existence at that time all amounts paid to them by the bank thereafter, and they are only entitled to recover such amounts as remain after such application of payments.

"8. He excepts to the judgment of the court in holding that the heirs and devisees of deceased stockholders of the bank are not liable for the amount due to be paid by such deceased stockholders and that only the personal representative of such deceased stockholder is liable for the payment of the amount due to be paid by the deceased stockholders.

"9. He excepts to the judgment of the court in failing to hold that said amended charter was invalid, ineffective and void because it was obtained by the bank at the time and under the condition under which the bank was operating when said amended charter was obtained."

The appeal by complainant is from so much of the decree as is set forth in the exceptions above stated.

The defendants appealed from so much of the decree as holds that they or any of them are liable in any respect for the debts and obligations of the defendant bank in existence at the time said amended charter was procured, and from the action of the court in ordering a reference to the Master to report what amount, if any, they or any of them are liable, and from the action of the court in failing and refusing to dismiss complainant's bill and the amendments

thereto as a whole, and from so much of the decree as holds that they are liable to a call on stock for benefit of creditors existing at the date of the charter amendment reducing the stock became effective, notwithstanding the bank was left solvent at and after such reduction.

Both parties have perfected their respective appeals and have assigned errors. The errors assigned are directed in the main to the matters made the basis of the exceptions hereinabove stated and , the portions of the decree appealed from by the respective parties.

We will first consider and dispose of the appeal and assignments of error of the defendant stockholders. These assignments are eight in number, and are all directed to the action and decree of the Chancellor in holding and decreeing that the stockholders of the bank, notwithstanding the legal reduction of the capital stock, were liable to existing creditors of the bank and subject to a call on their respective stock holdings, and in holding and decreeing that defendants were not entitled to have the bill dismissed in view of the holding by the Chancellor that the capital stock of the bank was legally reduced; and in holding and decreeing that notwithstanding the amendment reducing its capital stock, that the stockholders remain liable to creditors whose debts were in existence at the time the amendment became effective; and in holding and decreeing that the stockholders were liable for existing debts notwithstanding the valid reduction of the capital stock of the bank, and without regard as to whether the bank was placed in a solvent condition by reason of said stock reduction; and in not holding that by reason of the valid reduction of the capital stock the defendants were discharged from liability on stock subscriptions for existing debts; and in not holding and decreeing that the stockholders were not liable for existing debts if the bank was made and left in a solvent condition by the stock reduction.

The questions made by these several assignments of error will be considered and disposed of together and not separately, as they in fact present but two questions.

We are of the opinion that the Chancellor correctly held under the facts as disclosed by the record, that the legal requirements with reference to reducing the capital stock of the bank under the Tennessee statute on the subject was substantially complied with insofar as the regularity of the proceedings is concerned. However, this question will be later referred to in disposing of the assignments of error of the complainant.

We are further of the opinion that it does not definitely and affirmatively appear that the bank was entirely solvent at the time the reduction in capital stock was made. This question will also be more fully referred to in disposing of the assignments of error of complainant.

We think it well settled as a sound principle of law that a corporation cannot reduce its capital stock to the prejudice of existing creditors. The rule is thus stated in Vol. 5, Fletcher on Corporations, Sec. 3472, p. 5725:

"Thus, if a corporation undertakes to retire shares and release the subscribers from liability thereon for the amount unpaid on their subscriptions, the release is ineffectual as to existing creditors. . . ."

Unpaid stock subscriptions constitute assets of the bank and in a sense a trust fund for the protection of creditors of the bank. In a note to the case of Buck v. Ross (Conn.), 57 Am. St. Rep., 69, it is said:

"As a stockholder's liability for unpaid stock is assets and a trust fund for the payment of creditors of the corporation, it is evident that to release a stockholder from his liability, without consideration or not to enforce it, amounts, practically, to a 'withdrawing' of the assets of the corporation." See also Cushing v. Perot, 175 Pa. St., 66, 52 Am. St. Rep., 835; Thompson v. Reno Savings Bank, 19 Nev. 103, 3 Am. St. Rep., 797, and cases cited.

In this case it appears that the bank, by direction of the state bank examiners, shortly before the application for a reduction in the capital stock, had charged off as losses $30,000. It is clear from this record that because of the accumulated amount of assets of doubtful security, the bank was very much embarrassed at the time the application for the amendment to its charter reducing its capital stock was made. It is very probable that the bank officials did not fully realize the extent of the losses that it would sustain on account of insufficiently secured notes, and it is also very probable that the bank examiners and the State Superintendent of Banks did not know the full amount of losses that would be sustained, and the resultant impairment of the capital stock of the bank, when the application was made for the reduction. Evidently the State Superintendent of Banks was of the opinion that by reducing the capital stock to $25,000 it would take care of the impairment at that time. This would indicate that it was then considered that the impairment did not exceed $25,000, since the stockholders had paid 50% on original subscriptions, amounting to $50,000 paid in. By reducing the capital stock to $25,000, and issuing new certificates fully paid up for that amount that the difference between the $50,000 actually paid in and the reduction to $25,000 would make the corporation solvent. However, by this method it operated to prejudice the rights of existing creditors, if the stockholders were thereby released from the payment of the unpaid subscriptions on their shares. The unpaid subscriptions being assets of the bank for the protection of

creditors, remained an obligation upon the part of the stockholders, and from which they could not be relieved by a reduction of the capital stock, even though the reduction was regularly and legally effected. To permit this would be relieving the stockholders of a legal liability, and depriving the creditors of a legal right. This would be clearly true if it left the bank insolvent, or if there was any doubt as to its solvency at the time the reduction was made. We are inclined to agree with the holding of the Chancellor to the effect that the question of the solvency or insolvency of the bank at the time the reduction was made would be immaterial as to its effects against existing creditors. But if in this we are mistaken, we are further of the opinion that in either event it would have to appear clearly and beyond doubt that it left the bank entirely solvent in the sense that it had assets as of the date of the reduction of value in excess of its liabilities, other than to stockholders. While it is undoubtedly true that a solvent corporation may, under proper authority and by proper procedure reduce its capital stock, this cannot be done so as to release subscribers for liability on unpaid subscriptions against the rights and to the prejudice of creditors existing at the time. (Thompson on Corporations, 3 Ed., vol. 5, sec. 3695, pp. 326, 327.)

We are therefore of the opinion that the assignments of error of the defendants must be overruled, and the decree of the Chancellor holding that the reduction of the capital stock did not ·operate to relieve stockholders from liability for unpaid stock subscriptions for the protection of creditors existing at the time the reduction of the capital stock was made, is affirmed.

The assignments of error by complainants are numerous and it would be impracticable to set out and discuss each of these assignments separately, but we will dispose of the questions presented by the assignments filed by complainant.

By several of the assignments of error the regularity and legality of the amendment to the charter and the reduction of the captial stock is attacked.

As before stated in this opinion, the State Superintendent of Banks, in an effort to put this bank on a solvent financial basis, suggested two remedies. One, by calling for unpaid subscriptions sufficient to take care of the impairment of the capital stock, and second, a reduction of the capital stock to an amount that would cure the impairment. It is very clear that the officers of the bank did not desire to make a call upon the subscribers for additional payments, and by proper action and resolution of the stockholders made the application for a reduction in the capital stock. We deem it unnecessary to set out in this opinion the provisions of the statute which provides the method by which amendments to bank charters

may be made, but we refer to Sections 3273a92, Shannon's Code, and Sections 3273a93 and 94, Shannon's Code.

It is first claimed by complainant that the application which was submitted to the State Superintendent of Banks and approved by the State Superintendent of Banks was insufficient in form and substance, and was not in substantial compliance with the statute, in that, the application did not set out a detailed statement of facts. We think the Chancellor correctly held that the application and the amendment reducing the capital stock was in substantial compliance with the procedure provided by the statute. It is further contended by complainant that the bank was insolvent at the time the application for the amendment was made, and that this was known to the officers of the bank, and therefore constituted a fraud practiced by the bank officials on the State Superintendent of Banks in procuring his approval of the application. It being further contended because of the fact that the bank was insolvent and its insolvent condition known by the officers of the bank and unknown to the State Superintendent of Banks, rendered the amendment void.

We do not think that either of these contentions can be sustained under the facts of the record. While we think that it is very probable that the real condition of the bank at the time the amendment was procured was worse than the officers of the bank realized, yet we find nothing in the record that would warrant a conclusion that the officers of the bank made any wilful concealment of the bank's condition. It appears that $30,000 of losses had been charged off and no longer carried as assets. These losses resulted from insufficiently secured loans. At the time this was done it was thought by the officers of the bank and by the state bank examiners that the balance of the discounts and assets were sufficiently secured and solvent. Subsequently, the State Superintendent of Banks was not satisfied and demanded that the bank be placed in better financial condition by one or the other of the methods suggested by him. There is nothing in the record to warrant the conclusion that either the bank officials or the State Superintendent of Banks or the bank examiners did not honestly believe that by the reduction of the capital stock to $25,000 fully paid in would fully cure the impairment at that time. The bank continued to operate after the amendment and the reduction which was from December 3, 1924, until the bank closed in 1927. Since the major portion of the losses sustained by the bank and which ultimately resulted in the failure of the bank, was due to the decline in real estate values, and a large portion of the bank's assets consisted of notes secured by land liens or mortgages, it cannot be definitely known just when the losses actually accrued. It must have been gradual, as the decline in real estate

values was gradual. In this situation the best the bank officers could do would be to make a fair and reasonable estimate of the losses actually sustained, and this would reflect the financial condition of the bank. We are therefore of the opinion that there was no fraud on the part of the officers of the bank in procuring the amendment and the stock reduction.

Other assignments of error by this appellant go to the question of the rights of subsequent creditors, and the liability of stockholders for the debts and claims of creditors accruing after the reduction in capital stock. On this question complainant contends that the bank having been insolvent at the time the reduction in capital stock was made that it constituted a constructive fraud, and that persons dealing with the bank subsequent to the amendment were led to believe that the bank was solvent after the reduction of the stock and dealt with it accordingly, and that the stockholders are not therefore relieved of their liability to subsequent creditors, meaning creditors who became such after the reduction was made. We cannot agree to this contention. In the first place, as above stated, it does not definitely appear that the bank was actually insolvent after the reduction was made, nor does it definitely appear that the reduction of the capital stock did not accomplish the result intended, that is, cure the impairment. At any rate, we are of the opinion that persons dealing with the bank after the capital stock had been reduced, had constructive notice that the original certificates had been cancelled, and new certificates issued as fully paid up stock, and dealt with the bank with knowledge that there were no outstanding unpaid stock subscriptions to capital stock. In this situation, it placed them in the position of dealing with the bank as it was then constituted, as it was to all intents and purposes like dealing with a new bank with its stock subscriptions fully paid up.

Other assignments of error are directed to the holding of the Chancellor on the question as to who constituted creditors entitled to be treated as existing creditors, existing at the time the bank closed.

This question is not entirely free from difficulty, as pointed out by the Chancellor in his opinion filed with the record. The Chancellor held that depositors of the bank at the time the reduction in capital stock was made were existing creditors and protected under his decree, but further held that all withdrawals made by such depositors after the reduction in capital stock should be treated as credits on the claim or charges against the deposit, and that such depositors making deposits after the bank reduced its capital were dealing with it as other subsequent creditors, and that such deposits were not protected, but would stand on the same basis

as depositors whose accounts were opened with the bank after the reduction was made.

On this subject the Chancellor in his opinion states:

"We have already reached the conclusion that existing creditors (at the time the capital stock was reduced) may look to the unpaid stock for satisfaction of their claim; and that subsequent creditors had no such right.

"How shall we determine the amount which each particular depositor may claim as an existing creditor? Certainly he must be held to have made subsequent depositors, not on the faith of the cancelled stock, but on the faith of the capital stock as reduced. . . ."

The Chancellor concludes his opinion on this question by stating: "I am of the opinion that, in this case, those persons are to be regarded as existing creditors who, at the date of the reduction of capital stock became effective, were customers of the bank with a credit balance in their favor; and that the amount for which they may claim as existing creditors is to be ascertained by applying, first against that credit balance all checks thereafter drawn by the customer and paid by the bank."

This holding by the Chancellor appears to be in accord with the case of Devayner v. Noble, 1 Mar., 541, and in the text of Morse on Banks and Banking, 2 Ed., p. 32. In the Devayner v. Noble case, it appears that a partner in a banking house died; the business was continued without any real or formal change. Some customers knew of the death; others did not. There was no change in the daily course of the business and it continued in all respects as before the death of this partner up until the time the bank failed. Customers of the bank sought to hold the estate of the deceased partner liable for the satisfaction of their debts. The question presented was on what basis the accounts should be made up. It appeared that some of the accounts had increased while others had decreased, the amount of their respective deposits. The court in that case decreed that every payment made to each customer since the death of the partner should be applied in reduction of the debt or balance owing to that customer at the time of the death, and this equally, (1) where the customer had since made no deposit, but had drawn checks, (2) where the customer had continued to deal with the firm, depositing and checking, but on the whole increasing his balance; and (3) where, dealing in like manner he had decreased his balance. The court holding that each payment to the customer should be referred back and set against the earliest indebtedness to him, and further held that the rule sometimes laid down that, if at the time of the payment the debtor neglects to appropriate it to suit his own wishes, cannot be allowed to govern. It was upon the authority of the above case that the Chancellor in the present case

largely based his holding. We have been unable to find any authority contrary to the holding of the Chancellor in this case, but on principle we concur in the reasoning and in the conclusion reached by the Chancellor.

Having held that only creditors existing at the time of the reduction of the capital stock are entitled to claim against the unpaid stock subscriptions, and having held that creditors becoming such subsequent to the reduction of the stock cannot claim, then we think it clear that the class of creditors who were depositors at the time the bank reduced its capital would only be entitled to claim the amount of the balance shown as of the date of the reduction, December 3, 1924, less such withdrawals after the reduction, and that all deposits made after the reduction would stand in the aspect of new debts. It being clear that the relation of debtor and creditor is the relation between the depositor and the bank. We are therefore of the opinion that there is no error in the decree of the Chancellor on this question.

The next question presented by the assignments of error by complainant is that of the liability of the heirs of deceased stockholders. On this question the Chancellor held that the heirs of deceased stockholders could not be held liable. He held that the personal representative of any deceased stockholder would be liable as other stockholders for the debts of existing creditors and that such personal representative had already settled the estate and paid over to the heirs of the deceased, this would not render the heirs liable for the call on the subscription.

We think that in this holding the Chancellor was correct. We think the holding is supported by authority. 10 Cyc., pp. 718-719; Cook on Stock and Stockholders, par. 248.

This, we think, disposes of all questions made on the respective appeals material to the merits of the litigation. Without elaborating further, we are of the opinion that there is no error in the decree of the Chancellor, and it is in all respects accordingly affirmed. and the cause will be remanded to the Chancery Court of Weakley County for further proceedings under the decree. The cost of this appeal will be divided equally between the respective appellants and sureties on their respective appeal bonds.

Heiskell, J., and Steele, Sp. J., concur.