COMMUNITY GENERAL HOSPITAL, INC., W. L. WILHELM, HOMER L. ARMSTRONG, A. G. BAXTER, E. P. BOYD, GEORGE L. CLARKE, F. M. DUKE, JR., EARL MONTGOMERY, FRANK NICHOLS, JAMES M. PERRY, GEORGE E. RUSH, FRANK SMITH, W. B. SMITH, HOBSON VANDIVER, and DAVID BALLON, Trustee, Appellants, v. MYRTIS CONNERLY DIEHL, Individually and on Behalf of Other Stockholders of COMMUNITY GENERAL HOSPITAL, INC., and on Behalf of COMMUNITY GENERAL HOSPITAL, INC., et al., Appellees. —360 S. W. (2d) 935.

Western Section. April 27, 1962.

Certiorari Denied by Supreme Court October 4, 1962.

Homer L. Armstrong, Larry Creson, Myron A. Halle, Jr., Memphis, for appellants.

Montedonico, Boone, Gilliland, Heiskell & Loch, Exby, Moriarty & Goff, Memphis, for appellees.

AVERY, P. J. (W. S.) This suit was first instituted by Myrtis Connerly Diehl, an individual, as a preferred stockholder in the Community General Hospital, Inc., a Tennessee corporation, on behalf of herself and other stockholders of the same class against the Community General Hospital, Inc. and its Board of Directors alleged

to be twelve in number, and against David Ballon, as trustee under a certain deed of trust executed by the Board of Directors securing the payment of certain notes and conveying for that purpose the real estate belonging to the corporation.

The bill was first filed on June 14, 1960, and it sought the appointment of a receiver for the properties of the said corporate defendant for the purpose of having all of said property sold, all debts of the corporate entity paid, and a general distribution of the funds under orders of the Court. It also sought an injunction restraining the Board of Directors from disposing of any of the properties of said corporate entity, disbursing any of the funds of the corporation, hypothecating, selling, or concealing in any wise any of the assets, choses in action, etc., and from hypothecating or otherwise disposing of any of the shares of stock owned by any of the Board of Directors. It also sought the cancellation of what was alleged to be 712,000 shares of corporation's common stock said to have been issued to directors; for the recovery of the expense on the part of the complainant incurred in this suit and for such other and further relief as she and other persons standing in the same relationship to said corporate entity were entitled to.

It is not necessary to set out the specific statements found in this bill alleging the reasons why the Court should, through a receivership, take charge and dispose of all of the assets of the corporate entity and distribute the proceeds to the persons entitled thereto, including preferred stockholders, but suffice it to say that it alleged many irregularities on the part of the Board of Directors, which if true, would amount to fraud.

On presentation to the Chancellor he entered a fiat directing the issuance of the injunction upon the execution of a bond of $1,000, which was made and injunction promptly served.

Certain amendments were filed to the petition. Other parties were made defendants. Other parties were allowed to intervene as Pro Interesse Suo interveners. Answers were filed and on July 1, 1960, an order was entered by the Court appointing a receiver, one Edgar Bailey of Shelby County, Tennessee. The receiver was given access to all the books, records and property of the corporation and authorized a writ of possession, if necessary to issue in his behalf in order that such books, records and property might be turned over to him. The Court also appointed John M. Heiskell as attorney for the receiver and fixed the receiver's bond at $1,000. In that order there is a statement by the Court as follows:

"The Court invites all interested parties to make suggestions as to how the rights of all stockholders may be best protected and how the future affairs of the corporation may be best conducted."

Exceptions were taken to the order, which was based upon a memorandum prepared by the Court and filed on the same day setting forth his findings and reasons for the appointment of the receiver at that time. Before that order was made he offered to appoint for the receiver an attorney from each group of parties, but on refusal of counsel for defendants to agree to so serve, Mr. Heiskell of counsel for the complainant was appointed.

Defendants saved exceptions to the order and thereafter filed a petition with the Honorable L. D. Bejach, one of the Judges of this Court for a writ of supersedeas,

which was granted upon the execution of a bond as provided by the fiat or order of Judge Bejach. The writ was granted temporarily and a provision written into the order that the parties would apply to the entire Court for a writ of supersedeas on a fixed date. At that time the order was renewed and this Court granted the writ of supersedeas, but left the injunction bond effective and remanded the cause to the Chancery Court of Shelby County for hearing and final decree by that Court.

Thereafter other parties came into the cause, both as complainants and as defendants, including what is referred to as an Honorary Board of Directors, and as an Advisory Committee.

The cause was proceeded with in said Court and on July 1, 1960, the learned Chancellor filed his ''Findings and Opinions'', and on the same day he entered an order designated ''Second Interlocutory Order Appointing Receiver'' in which he again appointed Edgar Bailey as Receiver and directed that before entering upon his duties as such receiver he would execute a bond in the amount of $15,000 conditioned as required by law, and the receiver was directed to proceed to liquidate the corporation assets of every character, including the sale of the land, all subject to the approval of the Court and to report to the Court the amount of money available for distribution to creditors and stockholders.

On the same day the Chancellor entered a decree designated, ''Decree Liquidating Corporation, Cancelling Certain Shares of Common Stock And Ordering Distribution of Assets.'' This decree recites the fact that the cause had been heard upon the whole record and it refers to what that record is, including the orders contained in the Inter-

locutory decree. This decree provided in substance, (1) for the cancellation of 671,996 shares of common stock of the defendant corporation having a value of one cent per share, to be cancelled. (2) That 17,000 shares of common stock of defendant corporation with the same par value issued to 17 members of what is characterized as an Honorary Board of Directors, be cancelled and held for naught. (3) That the relief prayed in the petition of Ruth Gross Clarke pro interesse suo was denied temporarily, but retained for further action in the cause. (4) The Receiver is directed to proceed with the liquidation of the corporation and all of its affairs, reducing the same to money and to make distribution to preferred creditors, common creditors, preferred stockholders and common stockholders in accord as their rights might be determined, all subject to the approval of the Court. (5) That the cause would be retained in the Court for all other and necessary additional proceedings, orders and decrees. To this final decree exceptions were saved by the corporate defendant, its Board of Directors, and the appeal from the decree was prayed, granted and perfected to this Court where it was heard on the 20th day of December, 1961, and is now being disposed of by this opinion.

After the decree entered by the Chancellor on June 14, 1961, the now appellants made application to the Honorable C. S. Carney, Jr. one of the Judges of this Court for a writ of supersedeas directed to the second appointment of a receiver. This petition for supersedeas was denied by Judge Carney and an order was entered by him to that effect, and the appellants saved exceptions to that order.

Three assignments of error have been filed along with the brief of the facts and the law by appellants. The im-

portance of this cause and the proper conclusions to be reached by this Court require that these assignments of error be copied in this opinion, and are as follows:

"I.

"The Court below erred in finding and holding that the issuance of 671,996 shares of the 1¢ par value common capital stock to the thirteen individual appellants was invalid and should be cancelled.

"This was error because:

"(1) The pertinent statutes of the State of Tennessee expressly authorize the lawful issuance of the stock of a corporation for services rendered to it.

"(2) The fact that the individual appellants subscribed for stock, the subscription to be paid in services of the individual appellants to the corporation, has no invalidating effect whatever upon the ultimate issuance of such stock where, as in the instant case, as was intended by the parties, the stock was in fact issued in consideration of and after extended services had been rendered by the individual appellants to the corporation.

"II.

"The Court erred in finding and holding that the 1¢ common capital stock of the appellant corporation issued to the individual appellants should be cancelled, by reason of a breach of a so-called contract between the individual appellants for the benefit of 'future stockholders'.

"This was error because:

"(1) No rights of any preferred stockholder were fixed by any so-called contract; but were fixed ex-

clusively by the provisions of the charter of Community General Hospital, Inc.; and this record shows no evidence of disposition on the part of anyone to deprive preferred stockholders of any right fixed in said charter.

## "III.

"The Court erred in finding and holding that the individual appellants had misled stockholders, had failed to disclose information to stockholders, and had been guilty of other unconscionable conduct

"This was error because:

"Appellants filed an answer in the cause categorically denying all such charges and asserting the good faith and legality of all their conduct; and thereafter testified in the cause, under oath, in support of the averments of such answer; whereas, not one of the appellees (complainants) took the witness stand to testify in support of the charges made in their pleadings. Thus, there arises a strong presumption contrary to the charges made in appellee's pleadings and the findings of the Court below."

The cause was heard before the lower Court, by consent of the parties in writing, on oral testimony. Just as the cause was about to go to trial there were statements made by counsel for each party and also by the Court. Explanation was sought by the Court from counsel and in this conversation, among other things the following occurred:

"MR. CRESON: Your Honor, the defendants as individuals and Directors deny any wrong doing

whatever, deny there was any failure or any utter failure of purpose.

"THE COURT: I thought it was admitted there was a failure of purpose.

"MR. CRESON: To build a large hospital, your Honor, but I can read that portion of the Answer if your Honor would like me to do so.

"THE COURT: There was a resolution of stockholders directing the Directors to sell the property, and if they sold the property, I don't see how they can build any kind of hospital.

"MR. CRESON: Your Honor, there were two plans under consideration when the suit was filed. Once the suit was filed, it became extremely difficult to do anything.

"THE COURT: Doesn't your Answer to the amended bill recite that the property had been listed with L. A. Connerly for sale?

"MR. CRESON: Yes.

"THE COURT: If the property is sold, how can you carry out the building of the hospital?

"MR. CRESON: Your Honor, that listing is pursuant to the resolution of last November.

"THE COURT: Are you telling the Court that you listed this property but you had no idea of selling it?

"MR. CRESON: No; that was one of the two avenues the Directors thought might be open; that is, if we couldn't build a large hospital, then we might be able to build a small hospital, and we were

negotiating at the time of the filing of the bill, we thought that we might be able to sell the property and purchase land cheaper and then apply it to the purpose of building a small hospital, and all of this was under discussion by the Board at the time of the institution of this suit.

"THE COURT: Here is what your Answer says, this is the Answer to the Amended Bill—

"MR. CRESON: Perhaps I misunderstood your Honor, that is after the pendency of this suit that that answer to the amended bill was filed, of course. There is such a resolution, but the answer was devoted to the status of the affairs as of the time of the filing of the Original Bill, and that is what I meant by my remarks. We are contesting—

"THE COURT: (Interposing) Just a moment and let me finish reading your Answer.

"MR. CRESON: Your Honor, we weren't looking at it from a hindsight—

"THE COURT: (Interposing) Do you agree there is a liquidating process?

"MR. CRESON: (Interposing) Yes."

It is observed that while there is a general appeal prayed, granted and perfected, that the assignments of error pose only two questions. The first and second assignment pose the question:

DID THE COURT ERR IN HOLDING AND DECREEING THE CANCELLATION OF THE 671,-996 SHARES OF THE COMMON CAPITAL STOCK ISSUED TO THE INDIVIDUAL APPELLANTS?

2—DID THE COURT ERR IN FINDING, HOLD-
ING AND DECREEING THAT THE INDIVIDU-
AL APPELLANTS HAD MISLED THE STOCK-
HOLDERS BY FAILURE TO DISCLOSE PROP-
ER INFORMATION AND FINDING THEM
GUILTY OF OTHER UNCONSCIONABLE CON-
DUCT?

While there is no assignment of error to the effect
that the Court erred in appointing a receiver and order-
ing a sale or liquidation of the corporate assets, at
the conclusion of the brief, assignments of error and
argument of counsel for the appellants, there appears
this statement:

"In light of the foregoing, we respectfully
submit that the finding and decree of the Court be-
low is erroneous; that the Assignments of Error
filed on behalf of appellants are well taken and should
be sustained; and that a decree should be entered
in this Court sustaining appellants' lawful right to
the shares issued to them for services."

It seems to us that the end result, if we were to hold
that the directors had been guilty of no misconduct, and to
hold that the Court erred in the cancellation of the shares
of common stock held by this Board of Directors, it would
mean that the entire decree would be ineffective and that
the further management or liquidation of the corpora-
tion's assets would be in the hands of the Board of Di-
rectors. In other words it would simply mean that the
Board of Directors might move along toward the liquida-
tion of the assets of this corporation independent of the
receivership and the rights of the receiver, or the orders
of the Court.

From a preliminary study of this record it is very clear that the following facts have been proven or admitted by counsel representing the parties, and are undisputed:

1—The complaining parties are the owners of the stock alleged to be owned by each of them, and if the liquidation of the assets of the corporation is carried out, the preferred stock owners would be entitled to have from the funds realized, if sufficient, the payment of their preferred stock as represented by their certificates together with 6% interest thereon from the date of the purchase of the stock to the date of the disbursement to them in payment thereof.

2—It is admitted the original purpose of the corporation as stated in its charter and as shown by the minutes of the corporation and the prospecti issued during the effort to sell the stock, has failed.

3—It is admitted there are outstanding debts and obligations of the defendant corporation evidenced by trust deeds and otherwise.

4—It is admitted that there will have to be realized from the assets of the corporation more than $565,000 in order to pay the debts of the corporation and refund to the preferred stockholders the amount of their respective purchases of preferred stock together with 6% interest as dividend thereon referred to above.

5—It is admitted that the real estate owned by the defendant corporation is a very valuable piece of property, and the estimates of its value range from $500.00 per front foot to $800.00 per front foot.

6—It is admitted that it was the purpose of the Board of Directors in the issuance to them of the common stock

in excess of 56% for services rendered and to be rendered the corporation to put the control of the corporation absolutely within the said Directors, and that is was their purpose to keep control of the corporation in the way and manner set out in the testimony and affidavit of the Honorable Homer Armstrong, attorney for the corporation, and such is also shown by his evidence.

It should be further stated that the Minute Book of the corporation with all the recorded minutes showing action of the meeting of the stockholders, the Board of Directors, and the incorporators has been filed in evidence, and that the charter of incorporation, together with all necessary documents for the determination by the trial Court of the issues in this cause have been filed as a part of the record before the trial Court and now appear in the record before this Court. These exhibits include the escrow agreements with the Union Planters National Bank and the Bank of Commerce of Memphis, Tennessee, the depositories for the funds realized from the sale of preferred stock.

On September 13, 1958, a resolution was adopted by the Board of Directors authorizing the president and the secretary to issue to each director 1/13 of 56% of the common stock of the Community General Hospital, Inc., referred to as the Eastgate General Hospital, and each of the directors would take under that resolution 51,692 shares.

On November 17, 1958, at a meeting of the Board of Directors of the corporate defendant, it was resolved that the contract which had been agreed upon with respect to the issurance of this 56% of the common stock, 1/13

thereof to each member of the Board and which provided that the contract be signed by each member of the Board.

At the same meeting a resolution was offered and adopted whereby the corporate defendant, through its proper offices, were authorized to issue to the members of the Board of Directors of the corporation, who had loaned the funds thereto, preferred stock totaling $23,320.00 representing 2,332 shares as stated by the minutes, funds which the directors had loaned for expense incident to business of the corporation.

At this point in this opinion we think we should quote some of the provisions of the charter, particularly that found in Section 4, sub-section (a) and sub-section (b) as follows:

"4. (a) The preferred stock shall be preferred over the common stock as to assets, and in the event of any liquidation or dissolution or winding up of the corporation (whether voluntary or involuntary), the holders of the preferred stock shall be entitled to receive, out of the assets of the corporation available for distribution to its stockholders, whether from capital, surplus, or earnings, an amount equal to the par value thereof, with all dividends accrued or in arrears, but not the redemption premium hereinafter provided, for every share of their holding of preferred stock, before any distribution of the assets shall be made to the holders of the common stock, and shall be entitled to no other or further distribution. If, upon any such liquidation, dissolution, or winding up of the corporation, the assets thus distributable among the holders of the preferred stock shall be insufficient to permit the payment to such

preferred stockholders of the preferential amounts aforesaid, then the entire assets of the corporation thus distributable shall be distributed ratably among the holders of the preferred stock.

"(b). In the event of any liquidation, dissolution, or winding up of the corporation, (whether voluntary or involuntary), after payment in full of the amounts hereinbefore stated to be payable in respect of the preferred stock, the holders of the common stock shall be entitled, to the exclusion of the holders of the preferred stock, to share ratably in all the assets of the corporation then remaining."

In the period between August 6, 1956, and September 27, 1958 the Directors had issued three formal printed prospectuses, dated respectively February 1, 1958, March 31, 1958 and July 1, 1958. Each of these prospecti contained the following statements:

"The Directors subscribed for all the common shares, at par, and have agreed among themselves to use said stock in promotion and sale of the preferred shares, sales incentives for salesmen, obtaining key men in promotion and as incentive awards to obtain key personnel in operating the hospital.

\* \* \* \* \*

"The limit of expenses of promotion is $1.50 per unit. No officer or agent shall receive any salary or compensation during the promotion except within the expense allowed and provided above."

During the period covered by these three prospecti $345,325.00 of the preferred stock sale had been expended or obligated by the Directors. A very small percentage

of the preferred stock was taken by the public after that, and all the preferred stock held by the Directors amounting to $23,320.00, was issued after that period.

The principal witnesses who knew about the promotion, organization, charter procurement, election of officers, etc. were Dr. Wilhelm, who appears to be the brain-father of the proposed hospital and Mr. Homer Armstrong, the attorney who was connected with the promotion, organization, activities of Directors constantly as attorney, and for a great period of time Secretary-Treasurer. It would appear that he prepared the minutes, or at least a great part of them.

In the brief of appellees they say:

"* * * The witnesses on which appellees summarily relied to establish the allegations of the original and amended Bill warranting cancellation of the common stock were the Corporate Minute Book, (Ex. 3), the Financial Statements of the Corporation (Ex. 11(a) thru (f), and the Prospectuses (Ex. 10(a), (b) and (c), all of which were the records made, kept and vouched for by the individual appellants as promoters, officers and directors of Community General Hospital, Inc. These, coupled with appellant's collective testimony, heard orally in open court by the Chancellor who met the witnesses face to face, and evaluated their admissions as well as their denials, constitute the best available and most acceptable evidence concerning the appellants' stewardship of the corporate affairs."

So when we come to consider the testimony and proof offered in this case, we must remember that the Chancellor saw these witnesses face to face and heard

them testify, and the record reveals that he personally asked them a good many questions. We then are faced with the rule unless the proof preponderates against his decree, we are not to disturb it. Mathis et al. v. Campbell et al., 22 Tenn. App. 40, 46, 117 S. W. (2d) 764; Allen v. Goldstein, 40 Tenn. App. 308, 291 S. W. (2d) 596, at 603.

The insistence of the appellees for their grounds in support of the Chancellor's decree directing the cancellation of this promoters and directors common stock, and that such was issued without lawful authority, are as follows:

"(1) It was issued wholly without consideration;

"(2) It was issued, at least in part, for use in promotion and sale of preferred shares to the public, and as incentive awards to obtain key personnel in operating the hospital, but with the exception of only a relatively few shares, it was retained by the promoters for their sale and individual profit, contrary to their fiduciary duty;

"(3) To the extent that it was issued to compensate the promoters and directors for promotional and organizational services the consideration has failed, in that the promotion has either failed or been abondoned, and in that the promoters and directors have been guilty of neglect and mismanagement of the corporation's affairs.

"(4) It was issued in violation of the promoters' and directors' fiduciary duty in that the actual transaction and the effects thereof were concealed from public subscribers to the corporation's securities contrary to the fiduciary duty of the promoters and directors."

We do not believe there was any fraudulent purpose in the minds of these organizers and Board of Directors in their initial effort to promote, establish and organize what is referred to as The Eastgate Hospital. We do feel, however, that their anxiety, determination and their zeal, coupled with the fact that when they realized they were going to be unable to promote that which they had begun to a successful conclusion, caused them to take action inimical to the public benefit, and which could have easily and perhaps did, as represented by the three first prospecti issued, deceived the buying public of this preferred stock.

We have studied this record carefully and with the thought in mind that we are dealing with honorable men and women who were the first parties directly interested in the outcome of this particular cause of action. We do not characterize any of them as harboring an effort to cheat or defraud the public or the proposed corporate entity. We do feel, however, that the Chancellor has correctly analyzed the facts of this case as that which, in our opinion, constitutes a factual analyzation justifying the conclusions he has reached, and that he has filed a very complete finding of facts for the basis of his decree. We have carefully studied his original orders and decrees, a part of which this Court required to be further determined by the issuing of a writ of supersedeas and requiring the cause to go back to him for the taking of proof and final determination.

Therefore, we feel that we are constrained to adopt his finding of facts as that of this Court, and therefore, with the exception of setting out the particular pages of the record where these facts appear warranting his conclu-

sion, we make his finding of facts our finding of facts as herein set out, as follows:

"The complainant, joined by twenty-five other holders of preferred stock by the defendant corporation holding 1602 shares of such stock, did, on May 5, 1961, file an Amended and Supplemental Bill.

"The Bill, as now amended, prays for the appointment of a Receiver of the defendant corporation, that 712,000 shares of common stock issued to the directors be cancelled, that 17,000 shares of common stock issued to the honorary directors, who are defendants to the Bill as amended, be cancelled, and for other relief unnecessary to here state. The 712,000 shares referred to unquestionably designate the 671,996 shares of common stock issued to the directors under authority of a resolution of the Board of Directors under date of September 23, 1958.

"The cause came on regularly to be heard on Monday, May 29, 1961, the hearing being concluded on Thursday, June 1, 1961.

"The Court, in the disposition of this cause, reiterates the findings and statements made in its 'Conclusion of the Court on Application for Appointment of Receiver' heretofore filed, unless the same are varied or altered by this 'Findings and Opinion'.

"It was the purpose of the promoters of the defendant corporation, they being its officers and directors, and so represented to prospective purchasers of preferred stock, to construct a hospital, to be built and equipped as is portrayed in its prospectus dated March 31, 1958, that graphical picturing to prospec-

tive buyers of its preferred stock being in the following language:

" 'The hospital, grounds and complete equipment, ready for operation will cost an estimated $7,000,000 (seven million dollars).

" 'BUILDING—An 8-story building of 4 connecting wings with well-lighted, correctly ventilated and air-conditioned halls and rooms; incorporating every modern advantage that the finest architects and builders can put into use.

" 'FACILITIES—Providing everything necessary for modern patient care and comfort; 550 beds . . . . 10 operating rooms . . . . laboratory . . . . 4 delivery rooms . . . . 70-bed nursery . . . . 5 fluoroscopy rooms . . . . deep therapy room . . . . cobalt treatment room . . . . 2 emergency rooms . . . . drug store . . . . auxiliary service shops.

" 'LOCATION—Out of the downtown congested traffic . . . . in the newer residential area . . . . on the north side of Summer Avenue from Avon to Mendenhall on an 11-acre tract with 1200-foot frontage and a depth of about 400 feet . . . . Ample free parking is provided.

" 'OPERATING POLICIES—Nonsectarian . . . . non-affiliated . . . . open staff.

" 'PLANNING—Directly in charge of architectural plans is J. Frazer Smith Associates headed by Mr. Zeno L. Yeates, President, Tennessee Society of Architects. In the specialized field of Hospital planning, their design of LeBenheur Children's Hospital won international acclaim.'

"The incorporators and original directors embarked on a plan to exclusively control, manage and operate this multi-million dollar project without any investment of risk capital by any of them.

"It was proposed that the project be financed by the issuance and sale of 348,800 shares of preferred stock at $10.00 per share and primary financing to the amount of from $4,000,000 to $5,000,000.

"From what source the primary financing of from four to five million dollars was expected to be obtained is not shown nor is any commitment for any sum of primary financing made known in this record. Nevertheless, the officers and directors of the defendant corporation initiated a sale of the preferred stock.

"In the promotion, the officers and directors would have contributed no risk capital whatever except that, having advanced the corporation $23,200.00 for promotional purposes, the Blue Sky Division of the Department of Insurance and Banking of the State, as a prerequisite to further registration for sale of preferred stock subsequent to October 1, 1958, required the officers and directors to accept preferred stock for the moneys set up on the books of the corporation as a loan. This was authorized in a meeting of the directors held under date of November 17, 1958. No officer or director is known to have completely voluntarily invested one cent of risk capital in this project and promotion.

"Under the concept of the officers and directors, only the public could sustain a financial loss in the

venture, the only financial gamble of the officers and directors being whether or not there would be a profit to them and, if so, how much.

"The Court makes the above findings particularly to emphasize the conflict of interest between the officers and directors and those who were persuaded to subscribe for the preferred stock through the efforts of the officers and directors.

"The defendant corporation was authorized to issue 348,800 shares of preferred stock having a par value of ten ($10.00) dollars each and 1,200,000 shares of common stock having a par value of one cent ($.01) each.

"The project is classified by the officers and directors as a promotion, and, insofar as the officers and directors were concerned, it was exactly that.

"The manner in which the officers and directors were to acquire and retain control of the defendant corporation is set forth in the minutes of a meeting of the incorporators of the defendant corporation shown to be held on August 6, 1956, at 7:30 P.M., the pertinent provisions of these minutes being:

" 'Upon motion duly made, seconded, and unanimously carried it was

" 'RESOLVED, that the common stock of the Corporation be subscribed pro rata, by the directors, at par, they to pay for same in their services in promoting the Corporation, planning and aiding in the sale of the stock, except that Homer L. Armstrong should receive his stock for his services as attorney and counsel in services rendered and to be rendered dur-

ing organization and promotion; further conditioned that said stock should not be issued to the subscribers until completion or abandonment of the promotion, and that by majority vote of the directors so much of the common stock as might be advisable can hereafter be used in promotion, bonuses for salesmen, and any other purpose deemed helpful in making the promotion and commencing the hospital operation a success; that the expenses advanced heretofore and to be advanced later by directors should be credited as a debit of the corporation to the directors and repayable at the conclusion of the promotion; that a continuation in the promotion be a condition of participation in the stock subscription.'

''The language 'until completion or abandonment of the promotion' connotes to the Court that no such stock shall be issued until the promotion has been completed as contemplated or until further promotion was not needed for the attainment of the objectives of the promotion. Manifestly, the officers and directors of the defendant corporation could not, at any time, abandon an uncompleted promotion and those who might have been tolled into subscribing for preferred stock, and reap any benefit which might accrue to bona-fide holders for value of the common stock. The language in the resolution 'they to pay for same in their services in promoting the corporation', etc. and 'that a continuation in the promotion be a condition of participation in the stock subscription' emphasizes, in the opinion of the Court, the conclusion above expressed.

''At this meeting, eleven directors were elected.

"At a meeting of the directors shown as held the same day, but at 8:15 p. m., with nine of the eleven directors present, officers are shown to have been elected. Ten of the eleven directors had titles of either president, vice-president, secretary or treasurer.

"The directors approved options had for the purchase of the land now owned by the defendant corporation and it is shown that 'The president reported the meeting of the incorporators and the actions thereat were in all things approved'.

"A meeting of the stockholders is shown to have been held the same day at 9:30 p. m., with the same nine attending, and in the minutes it is shown that 'The President reported the Organization Meeting and First Meeting of The Directors to the Stockholders, and the actions of both groups were in all respects approved'.

"Under the Charter of the defendant corporation, the owners of common stock could always control the affairs of the corporation, and this is true though there might be a perpetual default in payment of dividends on the preferred stock, for a preferred share could never attain a greater voting strength than that had by a share of common stock. One share of common stock, by the will of the Directors, went with the sale of each share of preferred stock to the public.

"In the prospectuses issued under dates of February 1, 1958, (the first prospectus issued), March 31, 1958, and July 1, 1958, and in confirmation of the res-

olution of the incorporators of August 6, 1956, it is stated:

" 'The limit of expenses of promotion is $1.20 per unit. No officer or agent shall receive any salary *or compensation* during the promotion except within the expense allowed and provided above.

" 'The Directors subscribed for all the common shares, *at par,* and have agreed among themselves to use said stock in promotion and sale of the preferred shares, sales incentives for sales men, obtaining key personnel in promotion and as incentive awards to obtain key personnel in operating the hospital'.

"The sale of preferred stock is shown by the minutes of the Directors to have commenced on or about November 5, 1956.

"The attempt to sell the stock continued until about October 5, 1959.

"Subsequent to October 1, 1958, the total sales of stock amounted to $7,105.00, of which one sale accounted for $4,000.00 of the total sales.

"Under date of October 28, 1958 the following resolution appears in the minutes of the directors:

" 'Resolved that Community General Hospital, Inc. reapply and reinstate this corporation immediately under the Tennessee Insurance and Banking Laws, by furnishing necessary information to Mr. Miller for the purpose of selling stock in this Corporation.'

"Under date of November 17, 1958, the directors, as a condition to selling stock to the public subsequent to October 1, 1958, Resolved:

" 'That preferred stock be issued to the members of the Board of Directors in lieu of the amounts loaned by the members to the Corporation as reflected by the books as of the 30th day of September, 1958, in the amount of $23,200.00. So ordered.'

"This above action of the Board is reflected in the balance sheet shown on the retroactive prospectus issued under date of October 1, 1958. On the strength of this action, and probably others, the Blue Sky Division registered the preferred stock for sale until December 1, 1959.

"The Directors on September 23, 1958 had voted to issue to each of the then thirteen (13) directors one-thirteenth (1/13) of 56% of the common stock of the defendant corporation 'in the amount of 51,692 shares each. Subject to a contract approved by the Board and executed by every member of the Board'.

"The 1/13 of 56% of the authorized common stock issued to each director is sought to be cancelled in this cause.

"In the opinion of the Court, and it is its findings, the promotion of the defendant corporation, on September 23, 1958, was then dead and incapable of resurrection.

"That such is so, whatever the directors may have then wishfully thought, is conclusively evidenced by the previous failures to even approximate its goal and purposes and the fact that subsequent to October 1, 1958, the corporation was able to sell to the public only a total of $7,105.00 of its shares.

"It is the opinion of the Court that Mr. Homer L. Armstrong, vice-president and attorney for the defendant corporation has a very good understanding of the affairs of the corporation, but, except for Mr. Armstrong, the other officers and directors knew and know very little of its affairs, and had no real appreciation of their responsibilities or liabilities as officers and directors.

"The Prospectus retroactive as of October 1, 1958, makes the following statements:

" 'No salary or compensation, including legal fees shall be paid to any officer, agent or attorney during the promotion, except within the expense allowed and provided above for sales expenses.

" 'All Common Stock of the Corporation has been subscribed by the Directors, who have had issued to themselves 671,996 for services to the Corporation, which will be the limit of their Common Stock except as acquired on the same basis as any other purchaser, and have reserved the remainder for issuance with the preferred, in promotional incentives, and other purposes in connection therewith.

" 'The members of the Board of Directors have purchased $23,320.00 in Preferred Stock.'

"The above quoted statement from the prospectus is considered misleading and in part not completely factual.

"The second paragraph reciting that 671,996 shares were issued to the directors for services to the corporation contradicts the first paragraph, and, at the very least the issuance of that stock is consider-

ed by the Court to be a material breach of the contract or agreement of the officers and directors for the benefit of future stockholders as evidenced by the Minutes of August 6, 1956. Again the Board of Directors did not voluntarily purchase $23,320.00 in Preferred Stock as has been previously stated in this Opinion.

"In addition, the 671,996 shares were not issued to the directors 'for services to the Corporation' as stated in the prospectus. The contract between the Board Members, dated October 1, 1958, conclusively evidences that the 671,996 shares were issued 'for services rendered and to be rendered in said promotion'. This consideration for the issuance is further established on page 3 of the affidavit of Homer L. Armstrong filed herein on June 30, 1960.

"These shares of stock, under Section 48-204 of the Tennessee Code Annotated, could have been issued only 'for money, or other property, real or personal, tangible or intangible, or for labor or services actually received by, or conveyed or rendered to, the corporation for its use and lawful purposes, or in its possession as surplus'. Services to be rendered, indivisible from services rendered, could not, in the opinion of the Court, be a consideration when such services were to be performed in the promotion of a corporation and the corporation and the objective of the promotion completely failed. It is further the opinion of the Court that any good faith in the directors in issuing the stock could not give value to that which in law had no value.

"The cases of Morgan v. Bon Bon Co., Inc. (1917), 222 N.Y. 22, 118 N.E. 205; Petrishen v. Westmoreland Finance Corp. (1959), 394 Pa. 552, 147 A. (2d) 392; and Vineland Grape Juice Company v. Chandler et al., (1912), 80 N.J. Eq. 437, 85 A. 213, all cited by the defendants, in the opinion of the Court, support rather than contradict, the conclusions above expressed. The Pennsylvania case of Gearhart v. Standard Steel Car Company (1909), 223 Pa. 385, 72 A. 699, strengthens the conclusion of this Court with respect to the Petrishen case. The Tennessee cases cited are not considered in point on the issues presented.

"The most recent balance sheet of the corporation evidences $352,430.00 of preferred stock as issued or fully paid and to be issued. No disclosure of the purpose of the directors to issue 671,996 shares of the common stock to themselves was given to prospective buyers of stock, until, possibly, in the prospectus as of October 1, 1958, and it could only have been of advice to the holders of $7,105.00 in amounts of preferred stock.

"For reasons stated, the advice in the prospectus as of October 1, 1958, was contradictory and misleading. All previous prospectuses and all other available informative matter expressly disclaimed any attention of the officers and directors to issue any common stock to themselves until the successful termination of the promotion and this never happened.

"The Court concludes that the 671,996 shares which the officers and directors issued to themselves must be cancelled.

"The Bill, as amended, avers that 1,000 shares issued to each of the seventeen (17) members of an Honorary Board of Directors was issued without consideration and prays that this stock be cancelled.

"These seventeen men were made defendants and thirteen (13), by failing to answer, have confessed the allegations of the Bill against them. Four of these defendants have answered and none of these four makes claim that they have rendered any service to the defendant corporation.

"Accordingly, this 17,000 shares of common stock of the defendant corporation will be cancelled.

"The Court must now consider the prayer for the appointment of a Receiver.

"As has been stated, the objects of the defendant corporation are impossible of attainment, and the corporation has ceased to function. These matters are considered a sound basis, under the laws of this State, for the appointment of a Receiver. However, there are other reasons for such appointment.

"On October 5, 1959, a meeting of the stockholders of the defendant corporation was held. It was stated to the stockholders that time limit for the registration with the Department of Insurance and Banking for the sale of stock to the public would expire December 1, 1959, and that 'it was obvious the goal could not be reached and that continuation of the sale of stock was not possible', and that it was 'not

possible at this time to complete the necessary financing to build the hospital'.

"The stockholders, at this meeting, voted that the sale of stock be discontinued, and the Directors were authorized and directed to offer the real estate of the corporation for sale at the best and highest price obtainable.

"On April 25, 1960, the Board voted that 'if any of our proposed financial deals do not materialize by June 1, 1960, that the property be turned over to E. O. Bailey Real Estate Agency and Boyle Investment Company for immediate sale'.

"The 'proposed financial deals' did not and have never materialized—and probably were ultra vires. This cause was filed June 14, 1960.

"On October 20, 1960, the Board met with Mr. M. E. Jack, representing E. O. Bailey Company, and Mr. Robert Horrell, representing the Boyle Investment Company. The minutes state:

" 'Mr. Jack and Mr. Horrell stated that their proposal called for their taking the listing on the property to be sold at a price of $500.00 per front foot. They stated it was their opinion that such price was realistic'.

"It is understood by the Court that a price of $500.00 per front foot would realize a gross consideration of a little less than $600,000.00.

"As of February 28, 1961, it was determined by James L. Dallas & Company, the auditors of the defendant corporation, that it would require $567,678.62

to pay debts and preferred stockholders. The officers and directors admit the liability of the corporation to be substantially that figure.

"This determination appears in the record as exhibit 19.

"This calculation, if correct as to debts and the amount of preferred stock, does not include a real estate commission of 5% of the gross sale price and does not take into consideration that taxes are daily accruing and dividends on preferred stock are accumulating in excess of $1,750.00 each month. In addition, if the land is sold for a price in excess of those estimated in exhibit 19.

"It is the view of the Court that the defendant corporation will be fortunate if it can liquidate its affairs so as to pay its debts and preferred stockholders, and the longer liquidation is delayed, the probability of a lesser payment is enchanced.

"Under date of December 3, 1960, the Board of Directors, having discarded E. O. Bailey & Company and Boyle Investment Company and their advice, listed the property for sale with L. A. Connally Company at a price of $700.00 per front foot. This price, if obtained, would represent a gross sales price of a little under $840,000.00. No such sale at that price, or approaching that price, has been negotiated.

"There are many probabilities of conflict of interest between directors and preferred stockholders regardless of whether or not this Court is correct in cancelling the common stock in dispute. If the Court is in error in cancelling the common stock, the con-

flict of interest is most acute and severe. If the Court is correct in this cancellation, the public, who have subscribed to preferred stock, are in the hands of those who, under this opinion, have breached their contract with the subscribers.

"The Court is by no means satisfied that the balance sheet of the defendant corporation is correctly set up as to debt, preferred stockholders and common stockholders.

"The Board of Directors have issued 882 shares of Common Stock to an Advisory Board. The members of the Advisory Board are not before the Court, and the Court can make no determination of their rights as stockholders. It is not known what other rights members of the Advisory Board may claim.

"On or about October 2, 1959, the directors undertook to cancel, for delinquency in installment payments, some $43,000.00 or $44,000.00 of subscriptions to stock of the defendant corporation and to forfeit to the corporation the payments which had been made. The corporation has no contract with these subscribers—if one should be valid— by which this action was justified, and though inquired about in the hearing, no legal ground could be advanced to justify this action. This purported cancellation and forfeiture appears in violation of Section 48-206 of the Code, and what liability was incurred by this attempted cancellation is not now known.

"The officers and directors take the position that the amount of $6,043.50 held in escrow by the National Bank of Commerce in Memphis now belongs to the defendant corporation since the subscribers to stock

whose money is there held did not demand its return prior to December 1, 1960. The Corporation as found by this Court, had failed in its objectives prior to October 1, 1958, and the Court conceives that this fund may be the subject of litigation.

"It is shown in the record that Continental Southern Insurance Agency, Inc. subscribed for $13,500.00 in stock of the defendant corporation for which the Directors accepted a one year $100,000.00 term life insurance policy on the life of its president, Dr. Wilhelm. This appears a most irregular transaction in view of the agreement in force for escrowing the proceeds from stock subscriptions.

"The record evidences stock bonus plans for salesmen and purchasers of stock three free hospitalization agreements extending for 15, 10 and 5 years respectively, Founders Privileges calling for discounts on hospitalization and numerous cancellations of subscriptions in addition to the mass cancellation of subscriptions of some $43,000.00 or $44,000.00 in installment subscriptions. Just what legal or practical complications may arise from these and other transactions of the Officers and Board is not now known.

"If the Court has misstated any factual matter in this Findings and Opinion, counsel are invited to bring such to the attention of the Court.

"For all of the above stated matters, it is considered that a Receiver should be appointed so that rights and liabilities may be determined, the affairs of the defendant corporation liquidated in an im-

partial and reasonably expeditious manner and distribution be made to those entitled.

"Mr. Edgar Bailey will be appointed Receiver of the defendant corporation and his bond as such is fixed in the amount of $15,000.00. John M. Heiskell, Esq., will be appointed attorney and solicitor for the Receiver.

"So that an appeal will not vacate the appointment the procedure outlined in Section 941, Note 4, of Gibson's Suits in Chancery (5th Edition) will be followed, both an interlocutory and a final decree, as so outlined, to be entered in this cause on the same day.

"However, to allow the defendants an opportunity to supercede the appointment of the Receiver, the Receiver will not qualify until twenty days have elapsed from the entry of the orders of appointment.

"The injunction in force will be dissolved upon the qualification of the Receiver.

"All matters not determined herein are reserved for future determination.

"Decrees as indicated will be entered.

"This 5th day of June, 1961.

"CEYLON B. FRAZER
CHANCELLOR."

Counsel for the appellants after referring to certain recitations in the opinion of the Chancellor, have said:

"As we understand the above mentioned Findings and Opinion and the Decree entered pursuant there-

to, the Chancellor below took the view that the stock was issued for services 'rendered and to be rendered' and that, therefore, such issuance was void, as in conflict with the statutes of Tennessee. He advanced the further view that the issuance of such stock brought about a breach of an alleged contract between the individual appellants made 'for the benefit of future stockholders,' which, in some manner unknown to us, renders such stock void or voidable.

"It is the position of appellants that these findings which are the basis of the decision of the Court below are both factually and legally erroneous, and it is to these conclusions and the decree entered thereon, that we direct the following:"

So it is that the argument of counsel upon their assignments of error seem to have planted themselves upon only the two inner-quoted statements set out above which were taken from the opinion of the Chancellor. If that were true, the argument made by counsel for the appellant would be forcible indeed, and likely would persuade us to overrule the decree of the Chancellor. However, we do not construe the opinion of the Chancellor to be confined, with respect to what he determined had been done by these directors only when they issued themselves this common stock, and shown by his statements set forth in the inner quotes above set out.

It is our opinion that counsel has taken these two quotations out of the opinion of the Chancellor and thus disassociated them with the context in which the Chancellor was using these expressions.

The Chancellor distinctly points out in the opinion before he makes these particular findings, that the pro-

specti first issued called attention to the public that it was to be a $7,000,000.00 hospital,—the building to be eight stories high, four connecting wings etc.; the facilities to be 550-beds; 10 operating rooms; laboratory; four delivery rooms; 70-bed nursery; 5 fluoroscope rooms; deep therapy room; emergency rooms; drug store; auxiliary services etc. He had called attention to the location which these prospecti showed to be on the north side of Summer Avenue from Avon to Mendenhall on an 11-acre tract with 1200 foot frontage, a depth of about 400 feet, with free parking etc., and there was pointed out to the prospective purchasers certain operating policies of the hospital to be non-sectarian, non-affiliated and with an open staff, and that the purposes so stated had failed and had been abandoned.

With all of that information appearing in the prospecti and otherwise, a beautiful picture was painted to the buying public, and no doubt these promoters and directors had the same sort of a beautiful picture in their minds and desired to be recognized as a group of philanthropic contributors to the development of a great city and to have absolute control of an institution to be governed by them alone. He quoted from the minutes of August 6, 1956, the resolution with respect to the issuance of this common stock for promotional and organizational services wherein it is said:

"Further conditioned that said stock should not be issued to the subscribers until completion or abandonment of the promotion and that by majority vote of the directors so much of the common stock as might be advisable can hereafter be used in promotion, bonuses for salesmen and any purpose deemed helpful, etc."

He found that this expression, "until completion or abandonment of the promotion" meant that no such stock should be issued until the promotion had been completed as contemplated or until further promotion was not needed for the obtainment of the objectives of the promotion. The question of a "contract" was a term they themselves had applied to their relationship as reflected by their own minutes.

The Chancellor had pointed out that in this first prospectus issued February 1, 1958, March 31, 1958 and July 1, 1958, that there had been a limitation put upon the expenses incident to the promotion and that there was contained in these prospecti the statement, "NO OFFICER OR AGENT SHALL RECEIVE ANY SALARY OR COMPENSATION DURING THE PROMOTION EXCEPT WITHIN THE EXPENSE ALLOWED AND PROVIDED ABOVE". He further pointed out that the issuance of this common stock to these directors, was not known by any part of the public that had been furnished these previous prospecti to October 1, 1958, and that there having been only $7,105.00 in the amount of preferred stock issued after that date, these purchasers of this small amount of preferred stock were the only ones who possibly could have had the notice of the intention of the directors as expressed in the minutes directing the issuance of that 671,996 shares of common stock to the officers.

There is little need to further point out any provision of the finding of the facts by the Chancellor. Suffice it to say that the Chancellor held that these promoters and directors were guilty of a breach of their "fiduciary duty" owing to the persons who had purchased preferred stock in this corporate entity; that these promoters and

directors were guilty of neglect and mismanagement of the corporation's affairs, and that the actual transactions and effects growing from these transactions were concealed from the public subscribers to the corporation's securities in violation of that fiduciary duty of the promoters and directors. In other words that there had been a misappropriation, for their own benefit, in violation of their fiduciary responsibilities, duties and relationships, and it appears to us the action throughout, even though begun with the very best motives, the purchasers of this preferred stock were deceived, as a part of the buying public, in connection with representation contained in these prospecti. The fact that these respective informative documents had been approved by some State Department official to whom they were submitted would not justify the action of these promoters and directors.

He further held that the attempted cancellation of some $23,000 owing by the subscribers of the preferred stock to the defendant corporation by these directors, had no legal ground to justify such action and was in violation of the statutory provisions of Section 48-206 T. C. A. He also pointed out that the issuance of the shares of common stock under section 48-204 T. C. A. of the Code could have only been issued for cash or property of a tangible value or if issued for labor services, such must have had to have been previously performed in behalf of the corporation.

We might further say that after these stockholders met, as shown by this record, and all of the real estate which they had purchased was ordered put upon the market, directors undertake to make an explanation that there was some agreement by the stock owners to make

an effort to build a smaller hospital or engage upon a smaller adventure at some other place.

Had such happened, it would have been in direct violation of the description given to the public with respect to what would be built as is outlined in the Chancellor's finding of facts as hereinabove set out, but we are convinced from the evidence in this case that this building of a smaller hospital, or something of that character, was an afterthought on the part of these directors and that if it was discussed there never was, in reality, any intention by the stockholders of its being promoted.

It is insisted by the appellants that the Chancellor has undertaken to re-write the charter granted to this corporation and that there is no doctrine or law within this state or elsewhere in our Nation that empowers the Court to arbitrarily re-write and modify the plain terms of a lawfully issued and published corporate charter. We do not agree with that statement, we think that the construction placed upon the statements made in the several prospectuses by the Chancellor were correct. It is a matter of common knowledge that the stockholders or the anticipated purchasers of stock do not undertake to analyze the meaning of the provisions obtained within a corporate charter, but they do see the prospecti issued by which the promoters and incorporators propose to pursue their duties, and upon the statements contained in these prospecti, they do purchase such stock.

Again it is said by the counsel for the appellants that:

"Under the charter preferred stockholders bargained for a preference in assets and accrued dividends on dissolution, and common stockholders bargained or 'contracted' for any balance remaining,

and submit that the Chancellor should have sustained the integrity of the charter for both preferred and common stockholders, and that he had no power to arbitrarily confer upon preferred stockholders the rights provided under the charter for common stockholders.''

■ If the Chancellor was correct in holding that there had been a breach of fiduciary duties and responsibilities of these directors to the stockholders, even if there had been an expired contract, as we see the actions of these particular directors, it appearing that there had been no consideration for the issuance of this common stock to these directors, it could have been cancelled upon a proper procedure whether there had ever been a dissolution of the corporation or not, and could have been cancelled even if the corporation had continued and succeeded actually in the completion of the purpose for which it was organized. Such likely never would have happened, but that would not change the law with respect to the validity of this common stock held by these directors. Furthermore, it does not appear, so far as this record is concerned, that after the payment of the preferred stockholders, together with the interest in the form of dividends as they are entitled to, that there will be such a surplus as might be beneficial, to any particular extent, to any of the common stockholders.

All the text-writers, so far as we have been able to find, and all the cases, by Appellate Courts in Tennessee and elsewhere, specifically hold that corporate officers are in a fiduciary relationship to the corporation while they occupy that position and that they must act in good faith. This statement is supported by Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S. W. (2d) 344 and Central Bus

Lines v. Hamilton Nat. Bank, 34 Tenn. App. 480, 239 S. W. (2d) 583, relied upon by counsel for appellees.

The opinion citing cases for its authority, reference to which is here made, in the Central Bus Lines case above referred to, points out as follows:

"Corporate officers stand in a fiduciary relation to the corporation and while occupying such position they must act in the utmost good faith. They are not permitted to deal with the corporation nor its assets for their own private gain and cannot deal for themselves and for the corporation at one and the same time even though they own or control the great majority of the stock. If they do so act in violation of their trust they must account for any profits made by use of corporate assets.

T. C. A. sec. 48-204 under the title "Consideration for stock—non-assessable shares".

"Shares of stock shall be issued only for money, or for other property, real or personal, tangible or intangible, or for labor or services actually received by, or conveyed or rendered to, the corporation for its use and lawful purposes, or in its possession as surplus."

As stated by counsel for the appellees there are no specific decisions of our Courts in Tennessee under that statute. But it is our conclusion that the meat of the statute is expressed in its first sentence, which is that above quoted, and that where it says the particular stock may be issued "for labor or services actually received by, or conveyed or rendered to, the corporation for its use and lawful purposes, or in its possession as surplus."

It means such services as have already been rendered, and that there is no determination that the directors can make which with respect to the class and kind of stock we are now dealing with, the common stock of the par value of 1¢, can give value to a recitation for the issuance of such stock in payment of future services, and that when the directors undertake to issue stock for that purpose, and for a consideration of that character, the issuance thereof is invalid. See 24 Tenn. Law Review 584 and 37 A. L. R. 2d 913.

■ Either on the "Trust Fund" theory or on the "Asset Theory" unpaid subscriptions for corporate stock or value of stock issued without consideration may be recovered, or such issues declared void and cancelled. More specifically is this true where there is a determination that such action of the directors was not in good faith. Grigsby v. Ainsworth, 13 Tenn. App. 372, 381.

Looking for the moment to the corporate assets before we direct our final conclusion, in the opinion of the Chancellor rendered when he first appointed a receiver, which action was rejected by this Court in the first instance, he said:

"Under the charter provisions for liquidation, dissolution or winding up of the defendant corporation, if the land brings more than the par value of the subscribed preferred stock, *and it is shown to have a value in excess of twice that,* the preferred stockholders are paid back their proposed investment in a going corporation, possibly with some dividends, and the common stockholders divide the remainder of the sale price." (Emphasis added.)

That statement was found in his opinion of July 1, 1960.

In his final Findings and Opinion filed in the cause on June 6, 1961, the Court said:

"The Court, in the disposition of this cause, reiterates the finding and statements made in its 'Conclusion of the Court on Application for Appointment of Receiver' heretofore filed, unless the same are varied or altered by this 'Findings and Opinion.' "

Now from this final Findings and Opinion after he saw the witnesses and heard all the proof, we find nothing in it that indicates that the Court has held that the corporate assets are sufficient to pay the preferred stockholders the original amount of their purchases plus the dividends in the form of interest that they are entitled to, and the payment of other debts, including the $50,000.00 trust lien, and such other indebtedness as may be later shown to be owing by the corporation.

So when we come to the final analysis of the proof which the Chancellor has found, we look at the situation in this manner, and we so find:

1—The purpose for which the corporation was founded has failed.

2—The directors have authorized a sale of the assets.

3—The issuance to themselves of the common stock of approximately 56% or 671,996 shares is void.

4—Their statement in the minutes of their action in which they say that the stock to them is issued for services rendered and to be rendered is in conflict with what they undertake to testify to on the hearing

to the effect that all of the services had been performed before the issuance.

5—There has been no amendment to the charter which had authorized the board of directors to enter into and perform, under the corporate authority, something different from that which is set out in the original corporate charter, and contained in the prospecti upon which the greater amount of the preferred stock was subscribed and issued.

■ We have no fault to find with the statement of counsel for the appellants that the burden of proof of invalidity of the issuance of the involved common stock rests upon the party asserting it in such case as we have before us in which they cite Kelley Brothers v. Fletcher, 94 Tenn. 1, 28 S. W. 1099, for their authority. Neither do we have any fault to find with the general statement that a strong presumption arises, if complainants do not testify that if their testimony had been introduced it would not have supported the charges made in their pleadings. Relying for that statement upon Fisher v. Travelers' Ins. Co., 124 Tenn. 450, 138 S. W. 316.

■ Neither do we have any complaint to make with the statement of counsel for appellants that the rule in Tennessee will treat as payment for the issuance of corporate stock that which the parties have agreed shall be payment, unless fraud be shown. Citing Kelley Brothers v. Fletcher, 94 Tenn. 1, 28 S. W. 1099, and Jones, Assignee v. Whitworth, 94 Tenn. 602, 30 S. W. 736.

We know of no case, however, that holds that the complainants have to testify when they introduce such proof, —whether it comes from witnesses who might be defendants or friends of defendants, and by such proof

have carried the preponderance necessary for a judgment. With respect to the action of the corporation being valid unless fraud is shown, in the opinion of the Chancellor, as we understand it, he found that the unfair practices which had been carried on by these promoters and incorporators amounted to fraud against these preferred stockholders, and particularly so since the corporation had utterly failed in its purposes, and the common stock was issued under circumstances revealed by this record.

It is also insisted that it is lawful for corporate stock to be subscribed for on the basis for services rendered or to be rendered where the services are in fact rendered prior to the actual issuance of such corporate stock. For this statement they cite the Pennsylvania case of Petrishen v. Westmoreland Finance Corporation, 394 Pa. 552, 147 A (2d) 392. A reading of this record clearly shows that the stock attacked in that case was issued to one Joseph Marzello for services that he performed in a particular way and as an expert in connection with that corporation, and that his contract was a written contract approved by all of the stockholders. We have no such case before us here.

They also cite the case of Vineland Grape Juice Co. v. Chandler, which is a New Jersey case, reported in 80 N. J. Eq. 437, 85 A. 213. One of the issues in that case was the statute of limitations, which the Supreme Court said was a valid defense. Another was that the contract providing for the issuance of this stock for work to be performed was contingent upon services equivalent in value to 98% of the par value of the stock having been performed before issuance of such stock certificates. In that case three years service in promotion and organization of the corporation had been necessary and the corporation

had been active for five years and had been earned and paid a dividend to stockholders in that period of time.

They also cite the case of Morgan v. Bon Bon Co. Inc., which is a New York case, 222 N. Y. 22, 118 N. E. 205, and in that case the promoters had agreed on the very day that the corporation was organized to employ one Morgan and one Felter to set up a system of bookkeeping of a proper kind and character for the corporate entity. The promoters issued to themselves all of the stock in that corporation and suit was brought by Morgan to enforce the contract by which he and Felter were to have certain shares of stock in part payment for their services. The Court held that contract good, and we think rightly so. It does not control in the case now before us.

In the case of Hackney v. York relied upon by appellants is a Texas case, Tex. Civ. App., 18 S. W. (2d) 923. In that case the attorney which was employed had subscribed for $1,900.00 worth of this common stock, and had actually paid $950.00 in cash for that stock. He had a contract by which the other 50% of the par value of the stock was to be paid in his services as attorney for the corporation. The service was before stock issued. The suit was brought by a judgment creditor of the corporation seeking to require this attorney to pay that $950.00 which he had not paid in cash. The Court held that this particular creditor was not entitled to have that done. As far as the record shows there were no preferred stockholders connected with that corporate entity.

We have examined every case relied upon by the appellants and the cases relied upon by the appellees, and by the Chancellor as set out in his opinion.

The only thing that we have had some trouble in satisfying our own minds about is whether or not that Mr. Armstrong's services as attorney, since his stock was to be issued to him as shown by the minutes, and he was thereby to have some pay for his services, certainly with him as one of the directors and under the circumstances and facts shown by this record, his stock must be cancelled the same as the other common stockholders, as set out in the decree, but whether or not he is estopped from claiming some pay for his legal services rendered, we are not determining that question, but will leave it to the lower Court to determine after he has had the report from the Receiver and after the assets of the corporation have been liquidated and these preferred stockholders, secured creditors and other creditors have been paid, if a sufficient amount of assets are realized with which to make such payments. Then if there is a surplus after the cost is all paid in this cause, and the debts as herein set out, equity would not prevent the Court below from fixing some fee in that excess fund, though we doubt seriously if it will ever come to that because clearly it appears to us that the preferred stockholders and the secured creditors, court costs, attorney fees incident to this suit etc. may exceed the value to be realized from the sale of all of the assets of the corporation.

Now when these conditions exist it seems to us that a Court of Equity is surely within its rights, prerogatives and legal decrees to direct a liquidation of such corporate entity, and for that purpose to appoint a receiver to conclude that liquidation.

It is obvious from this record that the decree of the Chancellor is correct, as we have heretofore stated, and

have adopted his finding of facts. All of the assignments of error are overruled, and the cause is remanded to the Chancery Court of Shelby County there to be proceeded with in accord with the Decree of the Chancellor and in harmony with this opinion and decree of this Court.

Cost in this Court taxed to appellants and their sureties on their appeal bond and cost of lower Court to be adjudged in final decree of that Court.

Enter decree accordingly.

Carney and Bejach, JJ., concur.